## PEOPLE v WEST

Docket No. 62890. Decided April 25, 1980. On application by the defendant for leave to appeal the Supreme Court, in lieu of granting leave to appeal, reversed the defendant's conviction and remanded to the Ingham Circuit Court for a new trial.

Charles E. West was convicted by a jury in Ingham Circuit Court, Ray C. Hotchkiss, J., of first-degree murder. The people charged that the defendant killed David Childs with a shotgun in the course of the attempted commission of a robbery which had been planned by the defendant and three companions. The defendant testified that he became involved in a fight between Childs and another man, that he hit Childs with the barrel of the shotgun in the struggle, and that he tripped or fell on top of Childs, causing the shotgun to discharge accidentally. Before the defendant testified defense counsel moved to exclude reference to his prior Federal convictions of misprision of felony and of possession of an unregistered firearm. The trial court denied the motion without explanation, and the prosecutor was allowed to characterize the crimes as "assisting, receiving money and concealing knowledge of a bank robbery" and "possession of an unregistered shotgun, 14 inches in length", over objection by defense counsel. The trial court instructed the jury on first-degree murder, second-degree murder, manslaughter, and careless use of firearms, but refused the defendant's request to instruct on the offenses of voluntary manslaughter and involuntary manslaughter resulting from the intentional aiming of a firearm without malice. The Court of Appeals, D. E. Holbrook, P.J., and M. J. Kelly and Marutiak, JJ., affirmed in an unpublished per curiam opinion (Docket No. 77-2571). Defendant applies for leave to appeal. *Held:*

1. When a defendant moves to exclude reference to convictions for impeachment purposes, the trial court must recognize that it has discretion in the matter, and must positively indicate and identify its exercise of discretion. In this case the words "motion *in limine* denied" do not comply with the rule. Moreover, the prosecutor's unsworn statement that the clerk's office for the Federal District Court said the defendant's conviction was listed as "bank robbery, assisting and receiving money

and concealing knowledge of robbery", should not have been taken as fact.

2. Even if the conviction *was* listed as the prosecutor stated it was, that was not a proper characterization of the Federal crime of "misprision of felony". Conviction of this crime requires proof of an affirmative act of concealment in addition to failure to disclose. It does not, however, require "bank robbery" or "assisting and receiving money". The trial court could not have exercised its discretion to permit impeachment by this "conviction", because the conviction did not exist. Nor was the speculation that the jury might have found the prosecutor's characterization "easier to understand" than misprision of felony any reason for permitting the prosecutor to create a nonexistent crime. The jury was led by the prosecutor's questioning to believe that defendant had been convicted of a much more serious crime; the trial court made no attempt to correct it, despite objection by defense counsel. Finally, it is the prior conviction itself, and not the details of the offense (a shotgun 14 inches in length) which is the subject of impeachment. The impeachment by prior convictions was not properly handled.

3. The effect of the trial court's instruction was to condition the jury's right to consider lesser included offenses upon a finding that the defendant was not guilty of the principal charge. There is an important difference between permitting a jury to consider lesser included offenses only if it fails to find guilt of the principal offense, and permitting it to do so only if it first acquits on the principal charge. The court three times told the jury in effect "if you find the defendant not guilty of [the greater offense], then you should consider [the lesser offense]". The Court has expressly disapproved of instructions like these. The trial court erred reversibly in giving them.

4. The trial court refused the defendant's request to instruct on the offenses of voluntary manslaughter and involuntary manslaughter resulting from the intentional aiming of a firearm without malice. The defendant argues that these offenses are cognate lesser included offenses of felony murder, and that the evidence would have supported convictions of them. Voluntary manslaughter is not a necessarily included lesser offense of first-degree murder. It may be a lesser included offense, however, if the evidence presented at trial would have supported a verdict of guilty of voluntary manslaughter. The jurors could have believed the testimony of the defendant, who stated that Childs kicked him in the groin and also kicked and punched him repeatedly as they struggled, together with that part of the prosecution's theory which contended that the defendant inten-

tionally pulled the trigger; a conviction of voluntary manslaughter would then have been appropriate. If the jurors believed that the defendant intentionally *aimed* the gun *at* Childs (without malice) when he poked Childs in the ribs with it, but that the gun's discharge was accidental, then they could have convicted the defendant of involuntary manslaughter. At a retrial, the instructions should be given, if requested.

The defendant's conviction is reversed, and the case is remanded to Ingham Circuit Court for retrial.

Chief Justice Coleman concurred as to the issues of impeachment by prior convictions and instructions to the jury on the manslaughter offenses, but she dissented as to the court's interpretation of the instruction concerning the jury's right to consider lesser included offenses. It would be error for a trial judge to require a unanimous agreement of innocence on a higher charge before deliberation on lesser included offenses may begin, but because the court's instruction in this case did not require such unanimity, there is no reversible error on that ground.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Peter D. Houk,* Prosecuting Attorney, and *Charles M. Sibert,* Assistant Prosecuting Attorney, for the people.

*Neil H. Holt* for defendant.

PER CURIAM. Because the trial court erred, under *People v Jackson,* 391 Mich 323; 217 NW2d 22 (1974), and *People v Cherry,* 393 Mich 261; 224 NW2d 286 (1974), in handling the defendant's motion to exclude reference to his prior convictions and in giving an instruction on the order of jury deliberation expressly disapproved in *People v Hurst,* 396 Mich 1; 238 NW2d 6 (1976), and *People v Mays,* 407 Mich 619; 288 NW2d 207 (1980), we reverse the defendant's conviction.

I

Debra Allen testified that on June 11, 1976, Charles West, along with Shelvy and Lynda Ad-

ams[1] and herself, developed a plan to "pull a rip"
on one of Lynda's "tricks" (customers for prostitu-
tion). Lynda would go out looking for a "trick",
and when she returned to Allen's house in Lans-
ing, either West or Allen would remove money
from the man's wallet while Lynda took him into
the bathroom to wash off.

Lynda left at approximately 9 p.m. She returned
sometime after midnight with the victim, David
Allison Childs. Before Lynda brought Childs in-
side, Shelvy went into one bedroom, Allen into a
bathroom between the kitchen and the second
bedroom, and West out the back door. Through the
bathroom door, Allen heard Childs and Lynda
Adams conversing in the second bedroom. Childs
refused to pay because there had been no sexual
activity; Lynda demanded money for her "wasted
time".

Childs and Lynda then moved out into the living
room, where they continued their argument.
Through the crack in the door Allen saw Shelvy
step out and confront Childs, telling him that he
had to pay the money. A struggle then ensued
between the two men, with Lynda also hitting
Childs on the head and Shelvy pulling at Childs'
pants pockets looking for money.

At this point Debra Allen ran outside to get
West. She told West that "the guy wouldn't pay
Lynda her money and that they was in the house
fighting". West came running in and asked Shelvy
what happened. According to Allen, Shelvy "ex-
plained to him, you know, that the guy had
brought Lynda over here with intentions on spend-
ing some money and then he changed his mind

---

[1] Shelvy Adams pled guilty of second-degree murder on February 2,
1977; Lynda Adams was convicted of second-degree murder in a
subsequent bench trial. Debra Allen, who provided the people's
eyewitness testimony, was not charged.

* * * and he, we [couldn't] let him get away with that".

Shelvy then resumed hitting Childs, saying, "he is going to have to give it all up". West started hitting Childs too, also ordering him to "give it up" or "give up your money". Childs hit and kicked back. Meanwhile, Lynda was trying to search Childs' pockets.

Defendant then went away for a minute and returned with a shotgun that Debra Allen had seen in a basement clothes hamper. Defendant began hitting Childs with the barrel of the gun, repeating "give it up, give up the money". Shelvy got hold of Childs' arms and body in a "bear hug", and West poked at Childs' chest with the gun. The gun went off, killing Childs.

Allen testified that everyone was surprised. Lynda and Shelvy both said "I know you didn't mean to shoot him", and West vomited. The four then dragged the body outside. They started to look for the wallet, but saw someone in front of the house and decided to dispose of the body first. West and Shelvy then put the body in the trunk of Childs' car and drove it to Old Lansing Road, where police found it a few days later.

West testified that there was no talk about "pulling a rip". He knew what a "rip" was, and how Shelvy usually did it, but on this occasion there had been no such plan. What had happened was that West had left the Allen house on June 11, 1976, and had gone "riding around" the west side of Lansing. When he returned and was approaching the house, Allen came running outside and screamed "a man slapped Shelvy". West was surprised because he thought that men did not usually "slap" other men, and also because Shelvy

"just didn't fight". West ran into the house, grabbed a shotgun from behind the back door, and rushed into the living room.

He saw Shelvy and Childs fighting. Shelvy had a long butcher knife in one hand (Allen had testified that Shelvy kept a knife under the couch, and on this occasion had "something" in his hand). West ran over to Shelvy and pushed him away and said "Don't". Childs then kicked West in the groin, and West got angry and hit back. Childs continued to kick and hit. West hit Childs with the barrel of the gun, but not in the chest area, as Childs struggled to get the gun away from West. Finally West tripped or fell on top of Childs, and the gun accidentally discharged.

West could not remember anything being said about Childs giving up his money. West and Allen both testified that defendant had gotten the gun from Paris Collins. The gun had accidentally gone off when Collins was demonstrating it to West. Collins had then "racked" it again, but West had taken it away because Collins obviously did not know what he was doing.

Three firearms experts confirmed that the gun had a defect in the firing mechanism. When it was racked and cocked, and the trigger was pulled, it would sometimes fail to go off. It could then fire accidentally, if jarred at some later time. When the shotgun was given to the police, it had three live rounds in the magazine and one spent shell in the chamber. No shells were found anywhere in or around Allen's house.

West was convicted by a jury of felony murder. The Court of Appeals affirmed on February 22, 1979.

## II

Before the defendant took the stand, defense counsel moved to exclude reference to his prior

convictions. Both were Federal court convictions, one of misprision of felony and one of possession of an unregistered firearm. Defense counsel also stated that he understood the prosecutor was going to attempt to characterize the misprision of felony conviction as "accessory after the fact of bank robbery". He objected to this:

"And then the second aspect of this motion, depending on how the court would rule on the first motion, would be that the reference made after this time to the first felony conviction be that of misprision of felony rather than accessory after the fact of bank robbery, because of the inflammatory nature of that. I am not sure that a jury is familiar with what accessory after the fact would be. And I feel this would be prejudicial to my client when framed in that it actually is misprision of felony."

The prosecutor responded that the conviction should be allowed because it was relevant to credibility and not stale. He stated his opinion that accessory after the fact of bank robbery was "much easier to understand" than misprision of a felony. He then said:

"I called personally the clerk's office in Western District Court and asked them to check their records on Charles West and what he had been convicted of. They indicated to me that on June 22nd, 1973 in file G1173, CR he was convicted of the following crime: Bank robbery, assisting and receiving money and concealing knowledge of robbery. And that's the way I think it should be placed to the defendant, that is what his conviction was. I think the common term for that is in fact accessory after the fact of bank robbery. And I propose, I would place a question to Mr. West exactly as it is listed in the clerk's office in Western District Court as bank robbery, assisting and receiving money and concealing knowledge of robbery; second conviction,

G36-GCR indicating verbatim from the clerk's office that he was convicted on June 22, 1973 of possession of an unregistered shotgun, 14 inches in length."

Defense counsel did not respond to these arguments, and the trial court said "Motion *in limine* denied."

The defendant took the stand. At the end of the direct examination, defense counsel asked him about his prior convictions:

"*Q.* Have you ever been convicted of a crime of accessory after the fact?

"*A.* It, my understanding when the judge explained it to me it was, it was not telling the FBI about a bank robbery.

"*Q.* When was that?

"*A.* 1972.

"*Q.* Have you ever been convicted of any other felonies?

"*A.* Possession of unregistered firearm.

"*Q.* And when was that?

"*A.* In February of '73."

Then the prosecutor's cross-examination began as follows:

"*Q.* Isn't it true, Mr. West, that as to the not giving knowledge of a bank robbery, that conviction was in fact for assisting and receiving money?

"*Mr. Roberts [Defense Counsel]:* I will—objection, your Honor, I believe the question has been given as to what he was convicted of and I believe he has told the court and the jury with respect to what his recollection of that is entirely.

"*Mr. May [Assistant Prosecuting Attorney]:* I don't think he has a right to avoid my question on that ground. I think I can ask questions on cross-examination.

"*The Court:* I will allow it.

"*Q. (By Mr. May, continuing):* Isn't it true, Mr. West, that the conviction that you were convicted of in Federal court in Western District was for assisting, receiving money and concealing knowledge of a bank robbery?

"*A.* No, sir, it wasn't. The judge explained it to me and that's the way he explained it to me. The way I stated it.

"*Q.* And the *other* conviction, wasn't that a conviction of possession of an unregistered shotgun, 14 inches in length?

"*A.* Possession?

"*Q.* Possession of an unregistered shotgun, 14 inches in length?

"*A.* Yes, sir.

"*Q.* That was in Federal court too?

"*A.* Yes, sir. Both them was in Federal court."

The law in Michigan is clear that the trial judge must recognize that he has the discretion to exclude reference to prior convictions for impeachment purposes. *Jackson, supra,* 391 Mich 336. When defendant moves to exclude reference to the convictions, the trial court "must positively indicate and identify its exercise of discretion". *Cherry, supra.* In this case the words "Motion *in limine* denied" do not comply with the dictates of *Cherry* and *Jackson.* Moreover, the prosecutor's unsworn statement that the clerk's office said the defendant's conviction was listed as "bank robbery, assisting and receiving money and concealing knowledge of robbery", should not have been taken as fact.

Even if the conviction *was* listed as the prosecutor stated it was, that was not a proper characterization of "misprision of felony"; the Federal misprision of felony statute, 18 USC 4, states:

"Whoever, having knowledge of the actual commis-

sion of a felony cognizable by a court of the United
States, conceals and does not as soon as possible make
known the same to some judge or other person in civil
or military authority under the United States, shall be
fined not more than $500 or imprisoned not more than
three years, or both."

Conviction of this crime requires proof of an affir-
mative act of concealment in addition to failure to
disclose. *United States v Johnson,* 546 F2d 1225
(CA 5, 1977). It does not, however, require "bank
robbery" or "assisting and receiving money". The
trial court could not have exercised its discretion
to permit impeachment by this "conviction", be-
cause it did not exist. Nor was the speculation that
the jury might have found the prosecutor's charac-
terization "easier to understand" than misprision
of felony any reason for permitting the prosecutor
to create a non-existent crime. The jury was led by
the prosecutor's questioning to believe that defen-
dant had been convicted of a much more serious
crime; the trial court made no attempt to correct
it, despite objection by defense counsel. Finally, it
is the prior conviction itself, and not the details of
the offense (a firearm *14 inches in length)* which is
the subject of impeachment. The impeachment by
prior convictions was not properly handled.

### III

The trial court instructed the jury:

"Now, as I have indicated, Mr. Charles West comes
into this court charged with the offense of felony mur-
der, first degree. And I have indicated to you that by
law there are certain what we call lesser included
offenses contained within the more serious charge;
namely, second-degree murder, manslaughter, careless
use of firearms. And so I instruct you as follows: When

you go into the jury room your attention should be initially directed to the question of whether Mr. West is innocent or guilty of the charge made against him. If you decide that he is guilty of the charge made against him in keeping with my instructions and the facts and evidence as you find it to be, then of course you would return a verdict of guilty as charged. *If on the other hand you find that he is not guilty of felony murder* or first-degree murder on the date and at the time alleged and at the place alleged, *you would then turn your attention to the lesser included offenses.*" (Emphasis added.)

The effect of the court's instruction was to condition the jury's right to consider lesser included offenses upon a finding that the defendant was not guilty of the principal charge. An instruction like this was expressly disapproved in *Hurst, supra.* There is an important difference between permitting a jury to consider lesser included offenses only if it fails to find guilt of the principal offense, and permitting it to do so only if it first acquits on the principal charge. In three times telling the jury in effect "if you find Mr. West not guilty of [the greater offense], then you should consider [the lesser offense]", the trial court erred reversibly.

Instructions like these were expressly disapproved of in *Hurst* and *Mays, supra.* The trial court erred in giving them.

## IV

Because this case may be retried, we address another of the defendant's issues to assure error is avoided. The trial court refused the defendant's request to instruct on the offenses of voluntary manslaughter[2] and involuntary manslaughter resulting from the intentional aiming of a firearm

---

[2] MCL 750.321; MSA 28.553.

without malice.[3] The defendant argues that these offenses are cognate lesser included offenses of felony murder, and that the evidence would have supported convictions of them.

Voluntary manslaughter is not a necessarily included lesser offense of first-degree murder. It may be a lesser included offense, however, if the evidence presented at trial would have supported a verdict of guilty of voluntary manslaughter. *People v Van Wyck*, 402 Mich 266; 262 NW2d 638 (1978). The jurors could have believed the testimony of the defendant, who stated that Childs kicked him in the groin and also kicked and punched him repeatedly as they struggled, together with that part of the prosecution's theory which contended that the defendant intentionally pulled the trigger; a conviction of voluntary manslaughter would then have been appropriate. See, also, *People v Carter*, 395 Mich 434; 236 NW2d 500 (1975), and *People v Paul*, 395 Mich 444; 236 NW2d 486 (1975), holding that there are lesser included offenses of felony murder.

In *Paul, supra,* we found evidence to support a conviction of involuntary manslaughter resulting from the intentional aiming of a firearm without malice when the victim was killed by a shotgun blast that the defendant claimed was accidental. If the jurors believed that the defendant intentionally *aimed* the gun *at* Childs (without malice) when he poked Childs in the ribs with it, but that the gun's discharge was accidental, then they could have convicted the defendant of this crime. At a retrial, the instructions should be given, if requested.

In lieu of granting leave to appeal, pursuant to GCR 1963, 853.2(4), we reverse the defendant's

---

[3] MCL 750.329; MSA 28.561. See, also, CJI 16:4:06.

conviction and remand the case to Ingham Circuit Court for retrial.

KAVANAGH, WILLIAMS, LEVIN, FITZGERALD, RYAN, and BLAIR MOODY, JR., JJ., concurred.

COLEMAN, C.J. *(for affirmance in part and reversal in part).* I concur in Parts II and IV of the per curiam opinion, but respectfully dissent with reference to Part III for reasons of interpretation as stated in my recent dissent in *People v Mays,* 407 Mich 619; 288 NW2d 207 (1980).