PEOPLE v WOODS

PEOPLE v TUCKER

PEOPLE v ALEXANDER

Docket Nos. 63099, 65263, 65342. Argued December 2, 1981 (Calendar
    Nos. 8-10).—Decided December 23, 1982. Opinion released Janu-
    ary 25, 1983. Rehearing denied 417 Mich 1113 as to *Alexander*
    and *Woods.* Certiorari denied by the Supreme Court of the United
    States on June 20, 1983 as to *Alexander.*

  Ronald Woods and James Tucker were convicted by a jury in the
      Recorder's Court of Detroit, Joseph E. Maher, J., of first-degree
      murder. The Court of Appeals, Bashara, P.J., and Bronson and
      Simon, JJ., affirmed in an unpublished opinion per curiam
      (Docket Nos. 31334, 77-1290). The defendants appeal, arguing
      that the trial court's instruction that the law will imply malice
      from an unprovoked, inexcusable, and unjustifiable killing of
      another impermissibly interfered with the function of the jury
      in determining issues of fact, and that the prosecution failed to
      inform the jury of false testimony by a prosecution witness by
      merely mentioning the existence of a plea agreement with the
      witness in opening and closing statements, rather than by
      introducing evidence of the agreement.

  Annette G. Alexander was convicted by a jury in the Recorder's
      Court of Detroit, Robert L. Evans, J., of second-degree murder
      and possession of a firearm during the commission of a felony.
      The Court of Appeals, Danhof, C.J., and Cynar and MacKenzie,
      JJ., affirmed in an unpublished opinion per curiam (Docket No.
      46446). The defendant appeals, arguing that the trial court's
      instruction that a person is presumed to have intended the
      natural consequences of his acts in the absence of circum-

REFERENCES FOR POINTS IN HEADNOTES
[1-3] 40 Am Jur 2d, Homicide §§ 51, 472, 500.
    75 Am Jur 2d, Trial § 719.
[4] 21 Am Jur 2d, Criminal Law § 481 *et seq.*
    81 Am Jur 2d, Witnesses § 662.
[5] 29 Am Jur 2d, Evidence § 327.
[6] 75 Am Jur 2d, Trial § 883.
[7] 40 Am Jur 2d, Homicide § 112.
    75 Am Jur 2d, Trial § 781.

stances demonstrating the contrary shifted the prosecutor's burden of proving intent to the defendant.

In an opinion by Justice Ryan, joined by Chief Justice Fitzgerald and Justices Kavanagh, Williams, Levin, and Coleman, the Supreme Court *held:*

The instruction in *Woods* and *Tucker* was erroneous; however, the error was harmless because all the evidence indicated the existence of express malice. There was no evidence from which malice could have been implied by applying the erroneous instruction. The instruction in *Alexander* was also erroneous, but the error was not harmless. It involved the material element of intent which was directly disputed and for which the evidence was not overwhelming. The remainder of the instructions on malice in each of the cases do not involve errors which require reversal; however, the potentially misleading and arcane language of the instructions is disapproved, and the elements of murder no longer may be described by use of the terms "malice" or "malice aforethought". As to the plea agreement involving a prosecution witness in *Woods* and *Tucker,* it cannot be said that the jurors ignored the prosecutor's statements, but the better practice is to introduce evidence of an agreement on the record. In cases tried after the release of the opinion in this case, such corrective disclosures must be introduced into evidence.

1. An instruction that the law will imply malice from an unprovoked, inexcusable, and unjustifiable killing of another is erroneous because it may result in an impermissible interference with the function of the jury in determining issues of fact; the necessary factual element of malice may be permissibly inferred from the facts and circumstances of the killing, but it can never be established as a matter of law by proof of other facts. In *Woods* and *Tucker,* however, the defendants were not prejudiced by the instruction. No evidence of the defendants' acts supported or allowed an inference of malice, but, rather, indicated acts of express malice. Thus, the instruction on implied malice was superfluous. The court instructed the jury that either express or implied malice was sufficient to supply the element of malice for murder, and because malice could not have been inferred on the basis of the evidence presented and evidence clearly establishing express malice must have been believed, the instruction was not prejudicial.

2. A prosecutor has an affirmative duty to correct a witness's false testimony offered against a defendant that he was not promised consideration for his testimony. Until now, the manner in which such a disclosure was to be made was not

specified. The prosecutor was only required to disclose a plea agreement with a witness and to correct any testimony by the witness to the contrary. In *Woods* and *Tucker,* the prosecutor made disclosure during his opening and closing statements, and it cannot be said that he failed to discharge his duty or that the jurors ignored his statements. The better practice, however, is to introduce evidence of a plea agreement on the record. In cases tried after the release of the opinion in this case, such corrective disclosures must be introduced into evidence.

3. Defendant Woods alleged that the trial court's denial of his motion to suppress his prior felony conviction for impeachment purposes was an abuse of discretion. Under the law at the time of trial, evidence of prior felony convictions could be admitted and no record was required articulating all of the factors considered by the court in determining admissibility. The record does not indicate whether the court considered the similarity of the crimes to weigh in favor of admissibility or how any factors were weighed at all. The crimes in this case were not sufficiently similar to require extreme caution in admitting the evidence, and the record indicates no misapplication of the standards in effect at the time of trial.

4. Defendant Woods also alleged that the court's instruction to the jury that if it rejected the prosecution's theory of first-degree murder it could consider second-degree murder implied that the jury had to acquit the defendant of first-degree murder before it could deliberate on second-degree murder. The defendant raised no objection to this instruction during trial; however, the prosecutor did object. Instead of joining in the objection, defense counsel indicated his satisfaction with the instruction. Failure to object precludes review absent manifest injustice. A trial court may establish an order for consideration of possible verdicts so long as the jury is not left with the impression that it must acquit on one charge before considering another. In this case, the term "reject" as used by the trial court is not necessarily the functional equivalent of "acquit". At the time of trial, the instruction was not clearly erroneous. There is no evidence of actual prejudice, and the instruction did not result in manifest injustice.

5. The trial court's instruction in *Alexander* that people normally are presumed, with regard to wilful and intentional actions, to intend the consequences of their own acts in the absence of circumstances demonstrating something to the contrary operated as an instruction on intent, a necessary element of second-degree murder. It gives the impression that people intend the natural consequences of their acts. The instructions

to the jury that the state has the burden of proof beyond a reasonable doubt on all the elements of the crime and that the defendant is presumed innocent did not correct the possibility that a reasonable juror might have interpreted the presumption that the defendant intended the natural consequences of her acts as conclusive or as shifting the burden of proof. The defendant directly disputed that she had intended to kill, claiming that the killing was accidental. The evidence offered by the prosecution to prove the requisite intent was not overwhelming, and, thus, the instruction was not harmless beyond a reasonable doubt.

6. Instructions such as those in *Alexander* were long approved by the Supreme Court of Michigan. However, the Supreme Court of the United States found such instructions to be improper on due process grounds, in a decision made while *Alexander* was pending on appeal, which under federal case law must be applied to *Alexander* retroactively. Further retroactive application to Michigan cases is limited, under federal law, to those cases raising the same issue on direct appeal at the time the rule was stated in the federal case.

7. The instructions of the trial courts in these cases on murder included definitions of malice. None of the instructions on malice requires reversal; however, in order to avoid obscure language which has taken on different meanings through the years, the word "malice" and its progeny should be deleted from jury instructions. Rather than describing malice aforethought as a requisite element of murder, trial courts should indicate the states of mind required for murder: the intent to kill, to cause great bodily harm, or to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. The proposed criminal jury instructions could serve as models for trial courts, and their use is recommended, but not mandated. Instructions which are equally understandable, accurate, and fair may also be used.

*Woods* and *Tucker* affirmed.

*Alexander* reversed and remanded for a new trial.

1. HOMICIDE — MURDER — JURY INSTRUCTIONS — MALICE.

The word "malice" and its progeny should not be used in instructions to the jury in prosecutions for murder because it is obscure language which has taken on different meanings through the years; instead of describing malice aforethought as a requisite element of murder, trial courts should indicate the

7. HOMICIDE — INTENT — PRESUMPTIONS — JURY INSTRUCTIONS — PREJUDICE.

An instruction that, with regard to wilful and intentional actions, people are normally presumed to intend the consequences of their own acts in the absence of circumstances demonstrating something to the contrary is erroneous because a reasonable juror might have interpreted the presumption as conclusive or as shifting the burden of proof to the defendant, and was not harmless beyond a reasonable doubt where the defendant directly disputed an intent to kill and raised the defense of accident, and the evidence offered by the prosecution was not overwhelming.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Deputy Chief, Civil and Appeals, and *Michael F. Bakaian,* Assistant Prosecuting Attorney, in *Woods; Janice M. Joyce Bartee,* Assistant Prosecuting Attorney, in *Tucker; Timothy A. Baughman,* Assistant Prosecuting Attorney, in *Alexander,* for the people.

State Appellate Defender (by *Peter Jon Van Hoek)* for defendant Woods.

*Carl Ziemba* for defendant Tucker.

*Mogill, Bush, Posner, Cohen & Weiss* (by *Kenneth M. Mogill)* for defendant Alexander.

RYAN, J. We granted leave to appeal in these three cases and consolidated them for oral argument and disposition, primarily to consider the appropriateness of the language of "malice" and "malice aforethought" in the trial courts' murder instructions. Appellants in each of the cases contend that the instructions given were erroneous and misleading, resulting in a denial of due process.

7. Homicide — Intent — Presumptions — Jury Instructions —
    Prejudice.

An instruction that, with regard to wilful and intentional actions,
    people are normally presumed to intend the consequences of
    their own acts in the absence of circumstances demonstrating
    something to the contrary is erroneous because a reasonable
    juror might have interpreted the presumption as conclusive or
    as shifting the burden of proof to the defendant, and was not
    harmless beyond a reasonable doubt where the defendant di-
    rectly disputed an intent to kill and raised the defense of
    accident, and the evidence offered by the prosecution was not
    overwhelming.

*Frank J. Kelley,* Attorney General, *Louis J.
Caruso,* Solicitor General, *William L. Cahalan,*
Prosecuting Attorney, *Edward Reilly Wilson,* Dep-
uty Chief, Civil and Appeals, and *Michael F. Bak-
aian,* Assistant Prosecuting Attorney, in *Woods;
Janice M. Joyce Bartee,* Assistant Prosecuting At-
torney, in *Tucker; Timothy A. Baughman,* Assis-
tant Prosecuting Attorney, in *Alexander,* for the
people.

State Appellate Defender (by *Peter Jon Van
Hoek)* for defendant Woods.

*Carl Ziemba* for defendant Tucker.

*Mogill, Bush, Posner, Cohen & Weiss* (by *Ken-
neth M. Mogill)* for defendant Alexander.

RYAN, J. We granted leave to appeal in these
three cases and consolidated them for oral argu-
ment and disposition, primarily to consider the
appropriateness of the language of "malice" and
"malice aforethought" in the trial courts' murder
instructions. Appellants in each of the cases con-
tend that the instructions given were erroneous
and misleading, resulting in a denial of due pro-
cess.

In our review of the record, we have found error in all three cases; however, reversal and a new trial is ordered only as to defendant Alexander.

First, in *Tucker* and *Woods,* the trial court erred in instructing the jury that the law will imply malice from an unprovoked, inexcusable, unjustifiable killing. *People v Richardson,* 409 Mich 126; 293 NW2d 332 (1980). However, the error was harmless since all the evidence indicated the existence of express malice; there was no evidence from which malice could have been implied by applying the erroneous instruction. We also note that, although the prosecutor in *Woods* and *Tucker* informed the jury of a plea agreement made with the informant-witness, in the future under circumstances such as those extant in this case disclosure of such an agreement must be introduced into evidence.

Second, the trial court in *Alexander* erred in instructing that one is presumed to intend the natural consequences of his acts in the absence of circumstances that demonstrate something different. *People v Wright,* 408 Mich 1; 289 NW2d 1 (1980); see *Sandstrom v Montana,* 442 US 510; 99 S Ct 2450; 61 L Ed 2d 39 (1979). Because the error involved the material element of intent which was directly disputed and for which the evidence was not overwhelming, the error was not harmless. Reversal is required, for *Sandstrom* must be accorded limited retroactivity, *i.e.,* retroactive to those who raised the issue on direct appeal and whose appeal was pending when *Sandstrom* was decided.

Finally, we find no other reversible error in the trial courts' jury instructions on malice; however, we do take this opportunity to disapprove the potentially misleading and arcane language of the

instructions given in these cases and direct that, henceforth, the elements of murder must be described without the use of the terms "malice" or "malice aforethought".

## I. FACTS

Defendants Ronald Woods and James Tucker, along with their codefendant, Jerome McFadden, who is not a party to this appeal, were charged with and convicted after a jury trial of first-degree murder. MCL 750.316; MSA 28.548. The three were tried jointly on July 20-29, 1976, in the Recorder's Court of Detroit, and each was sentenced to the mandatory non-parolable life imprisonment.

Annette Gail Alexander was charged with second-degree murder and possession of a firearm during the commission of a felony. MCL 750.317; MSA 28.549, MCL 750.227b; MSA 28.424(2). She was found guilty on both counts by a jury on June 17, 1977, in the Recorder's Court, and was sentenced to 2-1/2 to 10 years on the first charge and to the mandatory 2-year consecutive sentence on the other.

### A

Woods, Tucker, and McFadden were convicted of the murder of John B. Jenkins, an alleged drug pusher, whose body was found in the stairwell of his apartment building in the City of Detroit on January 6, 1976, at about 2:30 a.m. The prosecution relied primarily upon the testimony of Willie Lee Lewis, a drug user, who testified that he was employed by the defendants in a "dope house". He

testified that he had overheard two conversations between the three defendants. During the first discussion, four days before the murder, Woods said that Jenkins was a snitch and "something had to be done". The second occurred on the night of the murder, and, at this time, Woods asked McFadden if he would "take out" Jenkins. McFadden replied that he would.

According to Lewis, Tucker then produced a pistol, wiped it, and handed it to Woods, who also wiped it and gave it to McFadden. The scheme was to intoxicate Jenkins with drugs and then kill him. The next morning McFadden told Lewis that he had "done it", that he had killed Jenkins on the first floor stairway of his apartment building. J. B. Jenkins was found dead with three bullet wounds in his body, and there was morphine in his blood as well as needle marks on his arm. Medical testimony established that he died from the bullet wounds.

Several others also gave testimony. Virginia Boddy testified that at about 2 a.m. on the day of the murder McFadden came to a foster care home at which she was employed and at which the deceased resided to see Jenkins, and that he and Jenkins left together. Tommie Lee Jones, a tenant of the apartment building where Jenkins was found, said that at about 2 a.m. he heard an argument, some shots, and then running. He looked out a window into the alley and saw a man and a woman, both elderly looking, get into a car. Clarine Williams, another tenant, said she heard three shots and someone holler and then, about a minute later, saw a girl come out the front of the apartment building. The girl put a shiny object, which Williams told police might have been a gun,

into her purse and then got into a car 15 minutes later.

All three defendants filed motions to suppress their prior felony convictions for impeachment purposes, should they choose to testify. The trial judge took Tucker's and McFadden's motions under advisement. Woods' motion to suppress his prior conviction of carrying a dangerous weapon was denied after the judge learned that the deceased died from gunshot wounds. None of the defendants took the stand.

At the trial, in his opening statement, the prosecutor told the jury that an agreement had been reached with.Lewis to allow him to plead guilty to unarmed robbery, a lesser offense of the charged crime of armed robbery, in return for his truthful testimony against the defendants. He also told the jury that his own statements were not evidence. Yet, during both direct and cross-examination, Lewis denied that any deal had been made. When defense counsel tried to show the inconsistency of Lewis' testimony with the prosecutor's earlier statement to the jury, the prosecutor objected on the basis that his opening statement was not evidence. Apparently the court sustained the objection. A similar objection to defense counsel's closing argument statements on the substance of the agreement was sustained. However, in his closing and rebuttal arguments, the prosecutor again stated that a deal had been made with Lewis, describing Lewis' denials as "evasive" because he was being a "snitch". In his instructions to the jury, the judge once again reminded the jury that his own statements and those of the attorneys were not testimony and that only the witness's

testimony and the exhibits were to be considered in determining the facts.

The trial judge also instructed the jury on the charged offense of first-degree murder and on the included offense of second-degree murder. In his instruction on the malice element for murder, he said:

"However, malice aforethought is the necessary element of murder both in the first and second degree. Malice includes, not only anger, hatred, and revenge, but every other unlawful, unjustifiable motive. It is not confined to a particular ill will to the deceased, but is intended to denote an act evolving from a wicked and corrupt motive that came down under such circumstances as carry in them the plain indication of a heart fatally bent on mischief.

"Malice means that condition of mind which prompts one to do a wrongful, felonious act intentionally without legal justification; therefore, malice is implied from any deliberate or cruel act against another, however sudden. The time within which the wicked purpose is formed is immaterial. Malice may be either implied or expressed, either one of which is sufficient to satisfy the requirements of the law.

"Expressed malice is where one with a sedate and deliberate mind and a formed design kills another, which formed design may be evidenced by certainly several circumstances disclosing an inward intention. For instance, threats, former grudges, lying in wait, those things would be evidence of expressed malice.

"Implied malice is where the law draws inferences and conclusions from the act itself. For instance, A meets B on the street. A is armed with a revolver. A takes the gun out of his pocket and shoots and kills B without any provocation, without any explanation or justification. This is a showing that this is done with malice. And it's said to be implied malice because the law will imply the existence of malice from the very act

itself, from the circumstances under which it was committed.

"The proof of either expressed or implied malice is all the law requires in order to have malice."

Defendant Tucker's timely appeal as of right, and Woods' granted delayed appeal, were consolidated by the Court of Appeals. That Court issued an unpublished per curiam opinion affirming on several issues raised, but remanded the case for supplementation of the record. This Court granted leave to appeal and ordered the cases of Woods, Tucker, and Alexander to be argued and submitted together. 411 Mich 899, 901 (1981).

B

On March 11, 1977, Annette Gail Alexander killed Lasloran Morris "Rip" Whitlow with a shotgun during a domestic argument in his home. Whitlow, who was separated from his wife and living with the defendant, was a drug dealer whom Alexander occasionally assisted in his deals.

Alexander's testimony described her activities during the day and the events leading up to the shooting. She testified that she had attended an afternoon funeral and visited with friends and relatives until about 9:30 p.m. She returned home, changed clothes, did some cleaning, and then fell asleep while watching television. She was awakened by Whitlow who "was very mad" and who asked where she had been. He ordered her to leave the house and struck her, knocking her to the floor.

When the deceased stopped striking her, Alexander got up and tried to get away from him, but he chased her around the house, slapping and kicking her and tearing her blouse. She then ran upstairs and procured a shotgun. By the time she obtained

the gun, he had turned around and was going downstairs. She went to the top of the stairs and informed the deceased that she wished to leave. Some words were exchanged with Whitlow who was off to the side of the stairs, out of sight, and on the first floor. She testified:

"I stood up there and I screamed and, uh, the gun was, like, slipping out of my hand, and I grabbed and the gun fired, and I was looking at the gun and not down the stairs, and after it went off he called me and I —.

"He said, 'Annette', and, uh, in a distressed way, and I ran down the stairs and he was laying on the floor, and he told me to go get help."

The defendant ran through the house several times because she was frightened. She then went across the street to her neighbor, Mrs. Nash, for help and asked her to call the Emergency Medical Service. Both Mrs. Nash and the police testified that they saw no cuts, bruises, or scratches on the defendant, but that her clothes were somewhat disarranged. She also was crying a great deal and extremely upset while waiting for the police, and later when they questioned and arrested her.

At trial, while instructing the jury on the elements of second-degree murder, the trial judge stated:

"The third element has to do with malice. I told you at the outset, members of the jury, that malice was a technical word. It has to do with the doing of an act against another human being, a cruel act against another human being without excuse or justification. So in order to determine whether or not Annette Alexander, if you find that she did kill the decedent, uh, if you find that she did it intentionally, in order to determine whether she did it maliciously, which is the third

element involved in second-degree murder, you must determine whether she acted maliciously. You must determine whether she did an act against Mr. Whitlow, the decedent, without legal excuse or justification. Whether she did a cruel act against another without legal excuse or justification.

"Now there are several ways to show malice, uh, sometimes malice is shown because it's expressed, what one person says doing the act—cruel act against another, an act designed to hurt another without excuse or justification. Sometimes the intention, the maliciousness involved in the act is expressed at the time. At other times malice must be inferred from the facts and the circumstances. The same is true when you try to determine whether or not an act was done maliciously —strike that—when you try to determine whether or not an act was done wilfully, intentionally; *you may presume, with regard to wilful and intentional actions, the* [sic] *people normally are presumed to intend the consequences of their own act.* People normally may not be heard to say that they did not intend the natural consequences of their act or their acts *in the absences* [sic] *of circumstances that demonstrate something to the contrary."* (Emphasis added.)

Later, at the jury's request, the trial judge redefined malice as signifying a

"wrongful act done intentionally without legal justification or excuse, includ[ing] all those evil conditions of mind, attending or impelling a homicide without extenuation, excuse, or legal justification.

\* \* \*

"What the law writers have said consistently about the element of malice, members of the jury, is that—is that what we're talking about is a technical word which includes not only anger, hatred, or revenge, but any other unlawful or unjustifiable motive.

"If I'm walking next to you down the street, and I suddenly take a large stick and hit you upside the head without legal excuse or justification then that act is malicious and so, in the final analysis, what we're

really talking, not about the character of the act done, but the lack of excuse or justification for the act.

"In this case, if you find malice at all, you will find that malice by determining that there was no legal excuse or justification for the killing. If there was excuse or justification then, by definition, there could be no malice."

The court also instructed on the presumption of innocence, the prosecutor's burden of proving the elements of the charges beyond a reasonable doubt, the elements of manslaughter and statutory manslaughter, and the elements of self-defense. He indicated several times that should the jury find that the shooting was accidental, the defendant could not be guilty of unlawful homicide unless she had intentionally aimed the shotgun at the decedent, in which case the statutory manslaughter law would control. The jury returned verdicts of guilty of murder in the second degree and of felony-firearm.

## II

Defendants Woods and Tucker have each briefed several issues—two of which are common to both defendants. Our review of the record indicates that error occurred in the trial judge's instructions on implied malice; however, it was harmless error. The other issues present no reversible error.

## A

After indicating to the jury that malice, either express or implied, was a necessary element for the crime of murder, the trial judge stated:

*"Implied malice is where the law draws inferences and conclusions from the act itself.* For instance A

meets B on the street. A is armed with a revolver. A takes the gun out of his pocket and shoots and kills B *without any provocation, without any explanation or justification.* This is a showing that this is done with malice. And it's said to be implied malice because *the law will imply the existence of malice from the very act itself,* from the circumstances under which it was committed.

"The proof of either expressed or implied malice is all the law requires in order to have malice." (Emphasis supplied.)

In *People v Richardson,* 409 Mich 126, 142, 143-144; 293 NW2d 332 (1980), we found a similar instruction to be reversible error. The instruction in that case was:

"Possibly I can make that clearer by an illustration, if one without any cause inflicts a wrong upon another, we call him malicious; so when one, without any legal provocation, justification or excuse intentionally kills another, we call him a murderer. *The law implies from the unprovoked, unjustifiable or inexcusable killing, the existance* [sic] *of that wicked disposition which the law terms malice aforethought.*

"*If a man kills another suddenly and without provocation, the law implies malice and the crime is murder.* If the provocation is sufficient as must have greatly provoked him so that he acted from sudden passion, caused by some grave provocation, the killing would be manslaughter.

"The instrument with which the killing was done will be taken into consideration by you *because the intention to kill in the absence of evidence showing a contrary intent* may be inferred by *[sic]* the use of a deadly weapon in such a manner that death of the person assaulted by the weapon would be an inevitable consequence." (Emphasis in original.)

We reasoned:

"The portion of the instruction which stated that *the law implies malice* 'from the unprovoked, unjustifiable, or inexcusable killing' or when 'a man kills another suddenly and without provocation' had the effect of withdrawing from the jury the essential factual issue of the existence of malice. The law, of course, does not imply malice from a sudden and unprovoked killing, and it was error to so instruct. The necessary factual element of malice may be permissibly inferred from the facts and circumstances of the killing, but it can never be *established as a matter of law* by proof of other facts."

In the immediate case, the instruction given was the functional equivalent of that given in *Richardson.* Both indicated that *the law will imply malice* from the unprovoked, inexcusable, unjustifiable killing of another, thus potentially resulting in an impermissible interference with the function of the jury in determining issues of fact.

Given that the instruction was erroneous, the issue becomes whether this error was harmless. The standard applied on appellate review is whether the error was prejudicial. *People v Robinson,* 386 Mich 551; 194 NW2d 709 (1972).[1]

Under the facts of the immediate case, the de-

---

[1] Other formulations of the appropriate standard may be found in both court rule and statute.

GCR 1963, 529.1 provides:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding shall construe these rules to secure the just, speedy, and inexpensive determination of every action so as to avoid the consequences of any error or defect in the proceeding which does not affect the substantial rights of the parties."

MCL 769.26; MSA 28.1096 provides:

"No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or

fendants were not prejudiced by the erroneous instruction, for the testimony of Willie Lee Lewis, which must have been believed by the jury to find the defendants guilty as accomplices of Jerome McFadden, indicated acts of express malice. No acts supported or allowed the implication of malice; thus the instruction on implied malice was completely superfluous.

The trial judge, immediately before his instruction on implied malice, stated:

"Expressed malice is where one with a sedate and deliberate mind and a formed design kills another, which formed design may be evidenced by certainly several circumstances disclosing an inward intention. For instance, threats, former grudges, lying in wait, those things would be evidence of expressed malice."

Lewis' testimony indicated a plan to kill, or a "formed design" which he heard formulated. The evidence in the prosecutor's case indicated that McFadden actually did the killing while the defendants aided and abetted him. Their acts consisted of planning the murder and giving McFadden the gun, neither of which indicate a sudden, unprovoked killing without any explanation or justification. By the same token, all of McFadden's acts were shown to be done pursuant to a plan to intoxicate the deceased with drugs and then kill him. Not one shred of evidence indicated that the killing by him was done pursuant to anything other than a formed design. No one saw McFadden kill Jenkins, so there was no evidence of a sudden, unprovoked act. Consequently, malice could not have been implied by the jury along the lines

procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice."

suggested by the erroneous instruction. This is also borne out by the fact that the jury must have believed Lewis' testimony concerning the plan in order to find the defendants guilty as accomplices. The court instructed the jury that either express or implied malice was sufficient to find malice, and since malice could not have been implied under the evidence presented and evidence clearly establishing express malice was believed, the instruction on implied malice was not prejudicial.

This may be contrasted with the situation in *Richardson* where we did find the error to be prejudicial.[2] In that case, it was not contested that

[2] It may be argued that since the defendant in *Richardson* was found guilty of first-degree murder, the jury must have found an intent to kill or express malice in that case as well. *People v Potter,* 5 Mich 1 (1858), seems to indicate this. Justice LEVIN, in *People v Morrin,* 31 Mich App 301, 327, fn 39; 187 NW2d 434 (1971), has interpreted that case as saying that "in cases of first-degree murder there is generally actual intent to kill (express malice)."

In *Richardson,* the jurors were instructed that the law implied malice from a sudden and unprovoked killing. Despite the defendant's claim of accident, the evidence indicated a sudden and unprovoked killing of the brother of the man who beat the defendant on the head with a brick. There was a strong possibility that the jury might have concluded that the element of malice necessary for murder had been established, so the defendant would have been guilty of at least second-degree murder.

To find one guilty of first-degree murder, there must also be established that the defendant premeditated and deliberated the killing. "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem". *Morrin,* p 329. See *People v Tilley,* 405 Mich 38; 273 NW2d 471 (1979). Once the jury was, in effect, instructed to find second-degree murder, it could easily have inferred the elements of premeditation and deliberation from the fact that the defendant placed a rifle under the front seat of his car immediately after receiving treatment for his injuries.

Thus, we disagree with the proposition that a verdict of guilty of first-degree murder necessarily included an implicit finding by the jury that the defendant had an intent to kill or express malice as that term was understood at the time of Richardson's trial. Our conclusion is further supported by the fact that we did not determine that first-degree murder was a specific-intent crime requiring an intention to take life until *People v Garcia,* 398 Mich 250; 247 NW2d 547 (1976), well over a year after Richardson's trial. Note also that *Garcia* settled a conflict in precedent.

the defendant had killed the victim. The main trial issue was the defendant's intent, which was vigorously contested, since the defendant claimed the killing was an accident. In *Woods* and *Tucker,* the issue was not intent but whether the defendants planned the killing. The instructions here had no bearing on the focal point of the trial. As stated in *Richardson,* 409 Mich 144:

"[T]he defendant's evidence and theory included notions of accident, *i.e.,* that the *sudden* and *unprovoked* killing of Paul Cook was also *unintended* and *accidental.* It is apparent that even if the jury had chosen to accept much of the defendant's version of the fatal episode, they might have convicted the defendant of murder because the evidence established a sudden and unprovoked killing which, according to the court's instructions, was murder."

The defendant Woods cites *People v Townes,* 391 Mich 578; 218 NW2d 136 (1974), and *People v Liggett,* 378 Mich 706; 148 NW2d 784 (1967), for the proposition that erroneous instructions on the essential elements of an offense mandate reversal. However, a per se rule was not applied in either case. The circumstances of both cases were examined to determine if the erroneous instructions were on elements *essential* to those cases, *i.e.,* was the instruction prejudicial to that defendant? Thus, the traditional harmless error analysis was applied.

A per se harmless error rule cannot be justified by quoting the general rule from cases such as *People v Visel,* 275 Mich 77, 81; 265 NW 781 (1936), that a "[d]efendant has a right to have a [properly instructed] jury pass upon the evidence". Whether an instruction is reversible depends on

whether it was prejudicial, and no reasoning or case law suggests that we should now discard that sound approach.

## B

Another issue of first impression common to the defendants is whether the prosecutor failed in his duty to inform the jury of false testimony by telling them in his opening and closing statements of the existence of a plea agreement with witness Willie Lee Lewis rather than introducing evidence to that effect.

Both defendants have cited cases for the proposition that the prosecutor has an affirmative duty to correct a witness's false testimony against a defendant that he was not promised consideration for his testimony. *Napue v Illinois,* 360 US 264; 79 S Ct 1173; 3 L Ed 2d 1217 (1959); *People v Atkins,* 397 Mich 163; 243 NW2d 292 (1976). The question is in what manner that duty must be fulfilled. Defendants contend that evidence must be introduced to rebut Lewis' testimony that his plea arrangement was not conditioned on anything, for only by the presentation of contrary evidence can the triers of fact be able to resolve the controversy consistent with their legal obligations. In other words, they contend that since the jury cannot consider statements of the lawyers or the judge as *evidence,* the jury is prevented from considering these statements for the purpose of determining the witness's credibility.

Clearly, the better practice is to introduce evidence on the record. The prosecutor would then manifestly fulfill his duty to correct false evidence. Prior to the time of this trial, our opinions[3] and

---

[3] See *People v Atkins,* 397 Mich 163; 243 NW2d 292 (1976).

those of the lower courts[4] did not specify a particular means of disclosure, only requiring that false testimony had to be corrected and that an agreement with a witness must be disclosed to the jury. In cases tried after the release of this opinion, we shall require corrective disclosures to be introduced into evidence; however, we cannot say that the prosecutor failed to discharge his duty upon the facts of this case.

The direct and cross-examination of Lewis revealed that he had been charged with armed robbery, that he contacted the homicide bureau first, that he pled guilty to unarmed robbery, and that he received probation. In *Atkins, supra,* p 173, a case in which the defendant claimed that a deal, actual or incipient, must have existed with the informer witness against him, we said:

"Where an accomplice or co-conspirator has been granted immunity or other leniency to secure his testimony, it is incumbent upon the prosecutor and the trial judge, if the fact comes to the court's attention, to disclose such fact to the jury upon request of defense counsel." (Citation omitted.)

We concluded in *Atkins* that the focus of required disclosure is on "facts which may motivate the witness in giving certain testimony" and that the jury was made well aware of this by the defense counsel's probing cross-examination. *Atkins,* p 174. Given the facts brought out during the trial as well as the statement made to the jury by the prosecutor, we believe that the jury was aware of the deal made with Lewis.

It is unclear why defense counsel did not have

---

[4] See *People v Cassell,* 63 Mich App 226; 234 NW2d 460 (1975); *People v Love,* 43 Mich App 608; 204 NW2d 714 (1972); *People v Nettles,* 41 Mich App 215; 199 NW2d 845 (1972); *People v Evans,* 30 Mich App 361; 186 NW2d 365 (1971).

the prosecutor stipulate to the existence of the agreement, or have someone involved with it testify as to its existence, or request an *Atkins* instruction. Perhaps, as the prosecutor contends, this was part of defense counsel's strategy. Counsel for defendant McFadden strongly emphasized the agreement's existence in his closing argument.[5]

We are fully cognizant of the trial judge's instructions that nothing said by the attorneys or himself was evidence for the purpose of determining facts and that the jury was to determine the credibility of a witness looking at the "evidence and other facts and circumstances apparent in the trial". We are also aware that Willie Lee Lewis' testimony was essential to this trial, and, thus, his credibility was of paramount importance. How-

[5] "Now, as you remember, the prosecutor in this case, did make an opening statement, and I presume now that maybe he wishes he could have taken it back. He said, well, in the opening statement 'isn't evidence' but of course, as you know, the prosecutor, Mr. Hogg, in his opening statement indicated and stated that they made a deal—they made a deal with Mr. Lewis. Mr. Lewis was originally charged with the offense of robbery armed. That's a capital offense, just like murder. Now, they made a deal with him, and they gave him robbery unarmed, and as a result of giving him robbery unarmed, they further interceded and they got him what they call probation, so they gave him a pretty good deal—

"*Mr. Hogg:* Your Honor, that is not the evidence. I have to object to that.

"*The Court:* You're assuming a fact not in evidence. We don't know that happened—sustained.

"*Mr. Tropp:* Well, all right, well, let me just say this to you then.

"They got him a deal, and they gave him robbery unarmed. Now, I did say—I did say to Mr. Lewis, I said, 'Did they help you in any way?' And he said, 'No, they didn't help me'.

"And ladies and gentlemen, I would say this to you that there is a major inconsistency there. Of course, they helped Mr. Lewis. They got the testimony from him by giving him the deal, but Mr. Lewis, of course, wouldn't admit that. And were the mind of man consistent, or consistencies thou art truly ado, and here is a major inconsistency on the part of the prosecutor, what he said in his opening statement and what Mr. Lewis said when he took the stand. 'No, they didn't give him any deals'. We know they gave him a deal. Mr. Hogg said they gave him a deal in the very opening statement that he made when he stood before the jury."

ever, in light of the prosecutor's repeated admissions that an agreement had been made, the testimony of Lewis' arrest, guilty plea, and probation, and the emphasis on the agreement made by McFadden's defense counsel, we cannot subscribe to the belief that the jury ignored the prosecutor's statements.[6]

Jurors are well aware that informers are often, if not usually, given consideration for their testimony, and we believe that the trial judge's instruction could not have prevented the jury from believing that Lewis was given consideration for his testimony. We find no reversible error.

## C

Defendant Woods alleges that the trial court abused its discretion in denying his motion to

[6] Defendant Tucker cites *United States v Bigeleisen,* 625 F2d 203 (CA 8, 1980), for the proposition that the prosecutor's revelation of an agreement in his opening statement was not sufficient to overcome the false testimony of an informer. The court there did not reverse solely on that ground, however. It also based reversal on the government's argument, without evidentiary support, that another witness was under investigation by the Internal Revenue Service.

In *Bigeleisen,* the prosecutor did reveal the existence of an agreement with a witness in his opening statement, but he did not try to set the record straight during closing argument after the witness had testified that no consideration had been given to him for his testimony. Rather, he capitalized on the witness's statement. The Court noted that the prosecutor's opening statement was not sufficient in itself to notify the jury of the agreement because the whole agreement was not revealed *and* it was not evidence. At no time did it say that the nonevidentiary value of the opening statement was in itself justification for a finding that the prosecutor did not fulfill his duty. It held that

"the combined effect of the government's failure to correct Moore's false testimony, the implication by the government during closing argument that Moore made no agreement, and the government's unsupported statements during closing argument about the I.R.S., was to deny Bigeleisen a fair trial." *Bigeleisen,* p 209, fn 2.

Clearly, *Woods* and *Tucker* differ greatly from *Bigeleisen* since the prosecutor did attempt to correct the false testimony in both the opening and closing statements. At no time did the prosecutor imply that an agreement had not been made, and no unsupported statements were made.

suppress his prior felony conviction for impeachment purposes, claiming that the court relied solely on the similarity between the instant charge and his prior conviction of unlawfully carrying a dangerous weapon on his person.

The defendant does not contest the fact that the judge realized that he had the discretion to preclude the use of the defendant's prior conviction for impeachment purposes. *People v Jackson,* 391 Mich 323; 217 NW2d 22 (1974). Nor does he claim that this Court's order amending MRE 609 and requiring an articulation on the record of the factors considered by the court in its decision on a motion to suppress, see 408 Mich cxv (1980), require reversal. Rather, he claims that the factors set forth in *Luck v United States,* 121 US App DC 151; 348 F2d 763 (1965), and *Gordon v United States,* 127 US App DC 343; 383 F2d 936 (1967), *cert den* 390 US 1029; 88 S Ct 1421; 20 L Ed 2d 287 (1968), as adopted by *Jackson, supra,* were improperly applied.

Under the law as it existed at the time of trial, similarity was only a factor weighing against the admissibility of a prior conviction. Convictions for acts similar to those one was being tried for would be admitted *sparingly. Gordon, supra,* p 347; 383 F2d 940. The point is that they could be admitted. No per se exclusionary rule for similar offenses existed, and *People v Baldwin,* 405 Mich 550; 275 NW2d 253 (1979), created none. Rather, in that case, we reversed because the lower court considered the similarity of the offense to be a factor in favor of admissibility. Subsequent summary reversals of lower court opinions on the basis of *Baldwin* were also predicated on the fact that the trial courts *on the record* improperly weighed similarity as a factor favoring admissibility. See, *e.g., People*

*v Oliver,* 407 Mich 857; 283 NW2d 502 (1979), *rev'g* 90 Mich App 144; 282 NW2d 262 (1979); *People v Cash,* 406 Mich 930; 277 NW2d 334 (1979), *rev'g* 80 Mich App 623; 264 NW2d 78 (1978).

The record of defendant's motion *in limine* is as follows:

"*Mr. Hudson:* I'm Mr. Hudson, your Honor, and I have a similar motion in regards to Mr. Woods. He has a conviction stemming from 1970 for unlawfully carrying a dangerous weapon on his person.

"*The Court:* That's a two-and-a-half year max; that's a felony.

"*Mr. Hudson:* That's correct, your Honor, and I request this honorable court in the event that he subsequently makes the decision to take the stand that the court take under consideration my motion to suppress.

"*The Court:* What is the cause of death here?

"*Mr. Hogg:* Three gunshot wounds.

"*The Court:* I deny your motion.

"*Mr. Hudson:* Your Honor, his conviction is unlawful attempt [to] carry a dangerous weapon on a person. I don't know if that would be considered to be attempt CCW or not.

"*The Court:* The statute is carrying a weapon with unlawful intent, and unless you carry a long gun and try to shoot somebody with it, that's carrying a concealed weapon. It doesn't matter whether it's a gun or a knife, all are considered to be dangerous weapons which are concealed.

"I will continue with this matter after lunch.

"*Mr. Hudson:* I'd like to bring to the court's attention that he was convicted of attempt carrying a dangerous weapon on his person. There was nothing about—

"*The Court:* If you have a number so you can check it, it might have been a blackjack or a knife. All of those are classified as dangerous weapons category, as well as a pistol."

The defendant admits that the prior conviction of carrying a dangerous weapon is not the same as a first-degree murder charge, but contends that there is a similarity in that a dangerous weapon was involved. We agree that there is some similarity, but the relationship is tenuous at best. The record indicates that the judge was not informed and did not know that the weapon which the defendant had carried or attempted to carry was a gun. For all he knew, it could have been a knife or a blackjack. The two crimes are not similar enough to give rise to an automatic inference of prejudice.

Furthermore, even assuming the crimes are similar, the record does not indicate that the judge considered similarity of the crimes to weigh *in favor* of admissibility. There is *no* indication how he weighed any factors at all. Prior to our 1980 modification of MRE 609, no record was required, and appellate case law indicated that a trial judge need not make a finding on all the factors affecting admissibility *on the record. People v Schram,* 98 Mich App 292; 296 NW2d 840 (1980); *People v Roberson,* 90 Mich App 196; 282 NW2d 280 (1979). These cases also required some affirmative showing of a misapplication of the admission criteria. We agree that that standard is appropriate to lower court decisions prior to our 1980 modification of MRE 609. No affirmative misapplication is apparent here.

We find no error here, for the crimes were not sufficiently similar to require application of the extreme caution required by *Gordon.* Even assuming the crimes were similar, the record indicates no affirmative misapplication of the *Luck-Gordon* standards.

## D

Defendant Woods also claims that the trial court

erred in conveying to the jury the impression that it had to acquit the defendant of the first-degree murder charge before any deliberation could take place on the included offense of second-degree murder. The trial judge instructed the jury:

"If you reject the theory of the prosecution that this was first-degree murder, you may consider the included offense of second-degree murder."

No objection was raised by the defendants to this instruction; however, the prosecutor did object, fearing that the language used by the court suggested a sequence of deliberations to the jury and implied that they must unanimously find the defendant not guilty of first-degree murder before second-degree murder could be considered.

Instead of joining the objection and asking the judge to give the jury a clarifying instruction, defense counsel once again indicated his satisfaction with that particular instruction.[7]

---

[7] The following colloquy, in relevant part, took place when the prosecutor objected to the judge's instruction:

*"The Court:* Well, they don't necessarily have to find him not guilty of first-degree murder. I think that they can go in there and find that they can't come to a meeting of the minds on first-degree murder and then find him guilty of second-degree murder. I think I had that in the case that ran through it twice and finally was decided just recently after six years; the Supreme Court finally came down with a decision on it. *People v Bumpkin & Carter [sic; People v Bufkin (On Rehearing),* 48 Mich App 290 (1973)]. This was a felony and I told them the same thing I told this jury. If they rejected the theory of the prosecution as to first-degree murder, then they could consider second-degree murder. It was a 2 to 1 decision in favor of affirming and the third judge, Ruchinski *[sic;* Lesinski] said that Carter could not be guilty of second-degree murder because there was nothing to show that he aided and abetted in second-degree murder. He merely drove the car and the Supreme Court completely reversed his stand on it. *[People v Carter,* 395 Mich 434 (1975)].

*"Mr. Hogg:* I understand the *Carter* case, your Honor, and I'm not quarreling with the fact that the jury can either find the defendants guilty of second-degree murder, first-degree murder, or not guilty. However, what I'm saying is that your charge then suggests to them that they must first consider the higher offense of first-degree murder

In *People v Hurst,* 396 Mich 1, 10; 238 NW2d 6 (1976), decided six months prior to the trial in this case, this Court disapproved of the instruction:

"If you find either of the defendants not guilty of the charge of manslaughter then you should proceed to determine whether that defendant not guilty of the crime of manslaughter is guilty of the crime of assault and battery."

We reasoned that this instruction "improperly interfered with the jury's deliberations by requiring agreement of all twelve jurors to acquit the accused of the charged offense before considering a lesser offense." *Hurst,* p 10.

Subsequent decisions by this Court indicated that it is not error to establish an order for consideration of possible verdicts so long as the jury is not left with the impression it must acquit on one charge before considering another. *People v West,*

before they can consider second-degree murder to get the sequence of deliberations which the Court of Appeals has recently found to be erroneous.

"*The Court:* Well, they're charged with first-degree murder; they're not charged with second-degree, so how can they discuss second-degree murder first? They're charged with first-degree murder. They have to get that out of the way, first.

"*Mr. Hogg:* I can't logically argue on it.

"*The Court:* I don't know the cases that you are talking about; I know the cases that I have sat on. I know how they've ruled on them in the past. I don't know of any change from that which would change my mind. Whatever they tell us to do we'll do.

"*Mr. Hogg:* Could I ask the court to inquire of defense counsel whether they are satisfied with that aspect of the charge that I've brought out?

"*The Court:* Well, they apparently are. They came up there and said they were.

"*Mr. Hogg:* Could I please make a record?

"*The Court:* Is there any objection to the charge?

"*Mr. Hill:* No objection.

"*Mr. Tropp:* No objection.

"*Mr. Hudson [attorney for defendant Woods]:* None."

408 Mich 332; 291 NW2d 48 (1980); *People v Mays,*
407 Mich 619, 623; 288 NW2d 207 (1980):

"It is not error to suggest an order of consideration of
offenses. The jury probably should be reminded to con-
sider the charged offense first and it probably would be
helpful to suggest that consideration be given to offen-
ses with a 'greater' number of elements before consider-
ing those with a 'lesser' number."

We note initially that the failure to object will
serve to preclude appellate review, absent mani-
fest injustice. This rule applies with particular
force here, where defense counsel failed to join the
prosecutor's laudable attempt to make it crystal
clear that the jury need not acquit before consider-
ing lesser offenses. In addition, the term "reject"
in the instruction is not necessarily the functional
equivalent of "acquit". While such an instruction
might be error under our later decisions, see *Peo-
ple v Handley,* 415 Mich 356; 329 NW2d 710 (1982), it
was not clearly erroneous at the time it was given.
Finding no evidence of actual prejudice on the
record, we cannot agree with the defendant that
this instruction created manifest injustice.

We find no reversible error on the facts of this
particular case.

## III

Defendant Annette Gail Alexander assigns six
errors to the trial court's disposition below. We
find that error occurred in the trial judge's in-
structions regarding a presumption of intent from
one's acts and that reversal is required. Thus, we
need not examine the other issues.

In his instructions to the jury, the trial judge stated:

"Now there are several ways to show malice, uh, sometimes malice is shown because it's expressed, what one person says doing the act—cruel act against another, an act designed to hurt another without excuse or justification. Sometimes the intention, the maliciousness involved in the act is expressed at the time. At other times malice must be inferred from the facts and the circumstances. The same is true when you try to determine whether or not an act was done maliciously —strike that—when you try to determine whether or not an act was done wilfully, intentionally; *you may presume, with regard to wilful and intentional actions, the [sic] people normally are presumed to intend the consequences of their own act. People normally may not be heard to say that they did not intend the natural consequences of their act or their acts in the absences [sic] of circumstances that demonstrate something to the contrary.*" (Emphasis supplied.)

The above instruction was given in the course of the trial judge's description of the third element of second-degree murder—malice—directly after he had stated that the second element of second-degree murder "is a wilful and intentioned act". Thus, it operated as an instruction on intent, a necessary element of the charged crime of second-degree murder.

In *People v Wright,* 408 Mich 1, 18-19; 289 NW2d 1 (1980), we found the following instruction to be constitutionally defective under the authority of *Sandstrom v Montana,* 442 US 510; 99 S Ct 2450; 61 L Ed 2d 39 (1979):

"But in connection with all this, *unless the testimony satisfies you of something else,* you are warranted in holding a party responsible for the natural, the probable, and the legitimate consequences of his or her acts.

The intent may be presumed from the doing of a wrongful or a fraudulent or an illegal act. But this inference or this presumption is not *necessarily* conclusive.

> *"The law presumes that every man or woman intends the natural, the probable, and the legitimate consequences of his or her own willful and voluntary acts. And wrongful acts knowingly or intentionally committed can neither be justified nor excused on the ground of innocent intent."* (Emphasis in original.)

The instruction in *Sandstrom* was that "the law presumes that a person intends the ordinary consequences of his voluntary acts". The United States Supreme Court found this to be improper under the Due Process Clause of the Fourteenth Amendment because a reasonable juror could have interpreted the presumption as conclusive or as shifting the burden of persuasion, making it rebuttable upon the presentation by the defendant of some quantum of proof, possibly more than "some" evidence. At no time was the jury told that the presumption could be rebutted by the defendant's presentation of "some" evidence, or that it was only a permissible inference. Consequently, a reasonable jury could have concluded that upon proof of the slaying (he was charged with "deliberate homicide") "and of additional facts not themselves establishing the element of intent, the burden was shifted to the defendant to prove that he lacked the requisite mental state", *Sandstrom, supra,* p 524, which is contrary to *Mullaney v Wilbur,* 421 US 684; 95 S Ct 1881; 44 L Ed 2d 508 (1975). Or, the jury could have found it to be a conclusive presumption, *i.e.,* the state's burden would have been found to be fulfilled *by law.*

The reasonable doubt standard gained constitutional stature in the case of *In re Winship,* 397 US 358, 364; 90 S Ct 1068; 25 L Ed 2d 368 (1970),

when the Court explicitly held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of *every fact* necessary to constitute the crime with which he is charged". (Emphasis supplied.) (As quoted in *Sandstrom, supra,* p 520.) The *Sandstrom* Court was concerned that the prosecutor's burden of proof beyond a reasonable doubt might have been shifted by the instructions given on an essential element of the crime charged.

The instruction in the immediate case was similarly defective, particularly the last sentence of the paragraph:

"People normally may not be heard to say that they did not intend the natural consequences of their act or their acts in the absences *[sic]* of circumstances that demonstrate something to the contrary."

"Normally" appears to refer to the "in the absence" clause at the end, and the double negative construction of the sentence gives one the impression that people intend the natural consequences of their acts. As in *Wright,* we are unsure whether the jury would interpret this as a conclusive presumption or as a burden-shifting device. The jury instructions that the state had the burden of proof beyond a reasonable doubt on all the elements and that the accused was presumed innocent until proved guilty did not correct the possibility that a reasonable juror might have interpreted the presumption as conclusive or as shifting the burden. *Wright, supra,* pp 22-23. The holdings in *Wright* and *Sandstrom* are controlling in the immediate case.

We must next determine whether the error was harmless beyond a reasonable doubt. "[B]efore a federal constitutional error can be held harmless,

the court must be able to declare a belief that it was harmless beyond a reasonable doubt", by a showing that "the error complained of did not contribute to the verdict obtained". *Chapman v California*, 386 US 18, 24; 87 S Ct 824; 17 L Ed 2d 705 (1967). When the improper evidence is merely cumulative and the admissible evidence overwhelming, a constitutional error may be deemed harmless. *Harrington v California*, 395 US 250; 89 S Ct 1726; 23 L Ed 2d 284 (1969).

In the immediate case, the defendant was charged with and convicted of second-degree murder. Intent was an element of the offense. However, this essential element was directly disputed by the defendant, for one of her theories of defense was that the killing was accidental. Because the erroneous instruction allowed the shifting of the prosecutor's burden on a critical element of the case, we cannot say that it did not contribute to the verdict obtained.[8]

This conclusion is further supported by the lack of overwhelming evidence on the element of intent. It is true that the evidence shows that the victim was not shot at close range, that he was not coming up the stairs at the time of the shooting, and that the deceased had just slapped, kicked, and otherwise physically mistreated the defendant.

---

[8] Most of the courts which have examined this issue have found a *Sandstrom* error to be not harmless when intent was an essential element. See *Dietz v Solem*, 640 F2d 126 (CA 8, 1981); *Burton v Bergman*, 649 F2d 428 (CA 6, 1981), *vacated on other grounds* 456 US 953; 102 S Ct 2026; 72 L Ed 2d 478 (1982); *State v Mincey*, 130 Ariz 389; 636 P2d 637 (1981); *People v Getch*, 50 NY2d 456; 429 NYS2d 579; 407 NE2d 425 (1980). Courts which have found the error to be harmless have done it on the basis that, despite the materiality of intent, it was never disputed, see, *e.g., Holloway v McElroy*, 632 F2d 605 (CA 5, 1980), *cert den* 451 US 1028; 101 S Ct 3019; 69 L Ed 2d 398 (1981); *Drinkwater v Gagnon*, 521 F Supp 1309 (ED Wis, 1981), or that there were indications that the jury did not follow the erroneous presumption, see *Pigee v Israel*, 503 F Supp 1170 (ED Wis, 1980), *aff'd on other grounds* 670 F2d 690 (1982).

Nevertheless, the evidence also indicates that the defendant and the victim were lovers who had lived together for quite a length of time. The defendant stated that she had retrieved the gun in order to protect herself, that the gun slipped from her hands, and that it discharged when she tried to grab it. She also testified that he called for her and asked her to get help. After her initial fright dissipated, she did seek help. Also, she was extremely upset and cried much of the time after the shooting. This evidence tends to corroborate a theory of accident. It is quite possible that in finding an intent to kill the jury inferred intent from the acts of the accused. There is no direct or circumstantial evidence which overwhelmingly proves the requisite intent. Thus, the constitutional error was not harmless.

Our next inquiry must be the retroactive effect of *Sandstrom v Montana, supra.*[9] Federal law gov-

---

[9] Many courts have examined this issue, the majority of which have determined that *Sandstrom* must be given retroactive effect. See *Dietz v Solem,* 640 F2d 126 (CA 8, 1981); *Burton v Bergman,* 649 F2d 428 (CA 6, 1981), *vacated on other grounds* 456 US 953; 102 S Ct 2026; 72 L Ed 2d 478 (1982); *Guthrie v Warden, Maryland Penitentiary,* 683 F2d 820 (CA 4, 1982); *Austin v Israel,* 516 F Supp 461 (ED Wis, 1981); *State v Mincey,* 130 Ariz 389; 636 P2d 637 (1981). Usually the cases finding retroactivity used little or no analysis in making their finding. Rather, they would note that the cases of *In re Winship,* 397 US 358; 90 S Ct 1068; 25 L Ed 2d 368 (1970), and *Mullaney v Wilbur,* 421 US 684; 95 S Ct 1881; 44 L Ed 2d 508 (1975), which were relied upon in *Sandstrom,* have been given retroactive effect. *Hankerson v North Carolina,* 432 US 233; 97 S Ct 2339; 53 L Ed 2d 306 (1977); *Ivan V v City of New York,* 407 US 203; 92 S Ct 1951; 32 L Ed 2d 659 (1972). Because of *Sandstrom's* similarity to *Mullaney, Sandstrom* would be declared to be retroactive.

Other courts have taken the approach that *Sandstrom* should be given "limited retroactivity", *i.e.,* retroactivity of the decision limited to the immediate litigants and those who have raised the issue on direct appeal and whose appeal is still pending. See *People v Getch,* 50 NY2d 456; 429 NYS2d 579 (1980); *Bowman v Leverette,* 289 SE2d 435 (W Va, 1982).

In *United States v Chiantese,* 560 F2d 1244 (CA 5, 1977), *cert den* 441 US 922; 99 S Ct 2030; 60 L Ed 2d 395 (1979), the Fifth Circuit adopted an automatic reversal rule for burden-shifting jury instruc-

erns, although we have followed the federal rule in *People v Hampton,* 384 Mich 669; 187 NW2d 404 (1971), where we adopted *Linkletter v Walker,* 381 US 618; 85 S Ct 1731; 14 L Ed 2d 601 (1965).

*United States v Johnson,* 457 US 537; 102 S Ct 2579; 73 L Ed 2d 202 (1982), is the Supreme Court's most recent opinion on retroactivity. There the Court established a three-fold threshold test to the *Linkletter* test which it derived by examining past cases. First, when a decision of the Court only applied settled precedents to new factual situations, the decision was retroactive. Second, where a new rule was expressly declared to be a "clean break" with the past, then almost always it was nonretroactive, and usually prospective only. Finally, where the decision found that the trial court lacked authority to convict or punish, it was given full retroactive effect. The *Johnson* Court found that *Payton v New York,* 445 US 573; 100 S Ct 1371; 63 L Ed 2d 639 (1980), prohibiting a warrantless, nonconsensual entry into a suspect's home in order to make a routine felony arrest, did not fit any of the above categories. It then established a general rule requiring the application of its decisions construing the Fourth Amendment to all convictions not yet final at the time the decision was rendered.[10]

tions, but held the rule to be prospective only. It later strongly implied that *Sandstrom* would not be given retroactive effect, *United States v Spiegel,* 604 F2d 961 (CA 5, 1979), *cert den* 446 US 935; 100 S Ct 2151; 64 L Ed 2d 787 (1980), although it has avoided the issue, *Holloway, supra.*

[10] The Court did not then apply the factors enumerated in *Stovall, infra,* p 618, under the *Linkletter* line of cases. Instead, having determined that the retroactivity questions were not clearly controlled by precedents, it asked whether the question could be fairly resolved by applying the rule in *Payton* to all cases still pending on direct review when *Payton* was decided. 457 US 554. It clearly indicated, however, that the *Linkletter* line of cases was still applicable to non-Fourth Amendment cases, particularly those involving the truth-finding function. 457 US 548, 549, fn 11.

*Sandstrom* also does not neatly fit any of the categories above. Clearly, it was not a new, unprecedented rule or one involving the authority of the trial court. Nor was it the mere application of settled precedents. The latter is an extremely vague category, for at least some authority is almost always cited as support for any decision.

In *Sandstrom,* the Court relied on four major cases for its decision—*Mullaney, supra, Winship, supra,* United States v United States Gypsum Co, 438 US 422; 98 S Ct 2864; 57 L Ed 2d 854 (1978), and *Morissette v United States,* 342 US 246; 72 S Ct 240; 96 L Ed 288 (1952). *Mullaney* dealt with a rebuttable presumption where the burden of proof was *explicitly* shifted to the defendant on an element of the crime charged. The latter two dealt with conclusive or irrebuttable presumptions of intent, for the jury was specifically instructed that upon a finding of certain facts, the defendants were presumed, as a matter of law, to have intended the result.

*Sandstrom* differs from the cases it relied on, for the Court found that a reasonable juror could have found that the erroneous instruction established a conclusive presumption, a burden-shifting inference, a permissive inference, or a mandatory inference requiring the defendant to come forward with only "some" evidence in rebuttal. Since a reasonable juror could have found that it established a conclusive or a rebuttable presumption, and since the verdict was a general one where an unconstitutional theory might have been used to convict, the Court reversed. *Sandstrom, supra,* p 526. Unlike the cases it relied on, *Sandstrom* did not involve an explicit conclusive or rebuttable presumption; rather, it dealt with one that could reasonably have been determined to be permissible

as well as mandatory. Because of the absence of an explicit affront to the truth-finding function, we do not believe that the cases relied upon in *Sandstrom* were the same rules in different factual clothing. Thus, we must apply the *Linkletter-Stovall* approach.

*Stovall v Denno,* 388 US 293; 87 S Ct 1967; 18 L Ed 2d 1199 (1967), established that retroactivity or nonretroactivity is a function of three considerations: (1) the purpose to be served by the new standards, (2) the reliance on the old standards, and (3) the effect on the administration of justice. The most important factor is the first one. *Desist v United States,* 394 US 244; 89 S Ct 1030; 22 L Ed 2d 248 (1969). In fact, the Court has said:

"Where the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect. Neither good-faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice has sufficed to require prospective application in these circumstances." *Williams v United States,* 401 US 646, 653; 91 S Ct 1148; 28 L Ed 2d 388 (1971).

*Mullaney* and *Winship* were given full retroactive effect on the basis that the purpose in both cases was to "diminish the probability that an innocent person would be convicted and thus to overcome an aspect of a criminal trial that 'substantially impairs the truth-finding function'." *Hankerson v North Carolina,* 432 US 233, 242; 97 S Ct 2339; 53 L Ed 2d 306 (1977) (making *Mullaney* retroactive). See *Ivan V v City of New York,* 407 US 203; 92 S Ct 1951; 32 L Ed 2d 659 (1972)

(making *Winship* retroactive). No decision on the retroactivity of *Morissette* and *United States Gypsum Co* has been issued; however, since they involved conclusive presumptions on material elements, we believe, and will assume for purposes of this discussion, that they would be given full retroactivity.

In *Winship* a judge had entered an order placing a juvenile in a training school potentially subjecting him to confinement for six years. His determination was based on a preponderance of the evidence, so the Supreme Court reversed, requiring proof beyond a reasonable doubt even in juvenile proceedings. This lower standard of proof clearly impaired the truth-finding function in criminal cases.

In *Mullaney,* the jury was instructed that "if the prosecution established that the homicide was both intentional and unlawful, malice aforethought was to be conclusively implied unless the defendant proved by a fair preponderance of the evidence that he acted in the heat of passion on sudden provocation". *Mullaney, supra,* 421 US 686. This allowed a defendant to be convicted of murder when it was as likely as not that he was actually guilty of manslaughter. The Court held that the burden was on the prosecutor to show the absence of the heat of passion on sudden provocation if the issue was properly presented. Thus, the instruction explicitly shifted the burden of proof on the element of intent required for murder—clearly affecting the truth-finding function.

*Sandstrom,* on the other hand, dealt with the situation where jurors might think a conclusive or a burden-shifting presumption was established. It was a possibility. However, the probability of this occurring is far less in the *Sandstrom* situation

than in the *Mullaney* situation. Consequently, the truth-finding function is not as substantially impaired in a *Sandstrom* situation. Unlike the situation in *Mullaney,* there is no *"clear* danger of convicting the innocent". *Tehan v United States,* 382 US 406, 416; 86 S Ct 459; 15 L Ed 2d 453 (1966).

Even "the question whether a constitutional rule of criminal procedure does or does not enhance the reliability of the fact-finding process at trial is necessarily a matter of degree" or a "question of probabilities". *Johnson v New Jersey,* 384 US 719, 728-729; 86 S Ct 1772; 16 L Ed 2d 882 (1966). The probability of convicting an innocent person is minimal in the case where an instruction could as easily be construed by a reasonable juror in a permissible manner. Thus, the purpose of *Sandstrom* does not obviate the need to examine the other factors affecting retroactivity.

The last two factors in the *Linkletter-Stovall* approach are the reliance on the old standards and the effect on the administration of justice. In Michigan, instructions similar to those used in the immediate case have been approved by the Michigan Supreme Court, *People v Medley,* 339 Mich 486; 64 NW2d 708 (1954); *People v Hodges,* 196 Mich 546; 162 NW 966 (1917); and by the Court of Appeals, *People v Nelson,* 35 Mich App 368; 192 NW2d 682 (1971); *People v McBride,* 30 Mich App 201; 186 NW2d 70 (1971).[11] Conceivably other cases

---

[11] In 3 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 1655, p 1999, the following instruction appears:

"Form No. 777. Murder—Use of Deadly Weapon.

*"The law presumes that every person, unless relieved by some disability as hereinafter mentioned, contemplates and intends the natural, ordinary, and usual consequences of his own voluntary acts, unless the contrary appears from the evidence,* and if a man is shown by the evidence, beyond a reasonable doubt, to have killed another by an act, the natural and ordinary consequences of which would be to

may be construed as having disapproved of such instructions;[12] however, the existence of unreversed cases approving of such instructions shows that lower courts probably relied on them.

Given this reliance, the effect full retroactivity would have on Michigan's system of justice is unacceptable. Since this Court long approved of such instructions, the number of cases where this instruction was used is surely enormous. Taking this into consideration with the purpose of the *Sandstrom* rule, we feel full retroactivity is unwarranted.

However, we decide that retroactive application to those defendants whose cases were pending on direct appeal when *Sandstrom* was decided is required if the issue was properly raised and preserved. *United States v Johnson, supra,* which allowed retroactive application of *Payton, supra,* to cases pending on direct appeal, was specifically limited to decisions involving the Fourth Amendment. *Johnson, supra,* 457 US 562. However, it clearly manifested a preference for limited retroactivity since it is consonant with the Court's original understanding of retroactivity in

produce death, then it will be presumed that death of the deceased was designed by the slayer, unless the facts and circumstances of the killing, or the evidence, create a reasonable doubt whether the killing was done purposely. When a man assaults another with, or, uses upon another a deadly weapon, in such a manner that the natural, ordinary, probable use of such deadly weapon in such manner would be to take life, the law presumes that such person so assaulting intended to take life. A deadly weapon has been defined as an instrument reasonably calculated and likely to produce death, or serious bodily injury from the manner in which it is used." (Emphasis supplied.)

This instruction was the one recommended by Gillespie at the time the trial in the *Alexander* case took place. The 1978 revised volume of Gillespie deletes it. Given that Gillespie was the virtual "bible" of trial court judges, we believe it reasonable to conclude that the erroneous instruction was heavily relied upon by Michigan courts.

[12] See, *e.g., People v Martin,* 392 Mich 553; 221 NW2d 336 (1974) (although that case could be limited to its facts); *Maher v People,* 10 Mich 212 (1862); but see *People v Potter,* 5 Mich 1 (1858).

*Linkletter,* does justice to " 'each litigant on the merits of his own case' ", 457 US 555, quoting *Desist, supra,* p 259, and furthers the goal of giving similar treatment to defendants similarly situated. 457 US 555. We find these reasons equally applicable to this case.

We believe a totally prospective application of *Sandstrom* is unwarranted not only because it was not a clear break from past precedent, but also because its purpose of reducing the probability of an innocent person being convicted, although not as high a probability as existed in *Mullaney,* is important enough to warrant limited retroactivity. The truth-finding function was not *substantially* impaired in the *Sandstrom* case, but it was affected enough to require that Annette Alexander's conviction be reversed since she did raise this issue on her appeal to the Court of Appeals.

In summation, the jury instruction in this case was substantially similar to those disapproved of in *People v Wright* and *Sandstrom v Montana.* Since the instruction dealt with the defendant's intent, an element of the crime which was directly disputed, the erroneous instruction cannot be said to have been harmless beyond a reasonable doubt. Finally, *Sandstrom* is sufficiently distinguishable from the cases it relied upon not to require full retroactivity. Rather, retroactivity to all cases raising the issue and pending on direct appeal at the time *Sandstrom* was decided is required. This mandates the reversal of Annette Alexander's conviction.

IV

The final issue of importance raised by all three defendants and the primary reason why we granted leave to appeal is the appropriateness of

the instructions on malice. We have already found error in part of the malice instructions for each defendant, although reversal was required only in the *Alexander* case.

Examining the rest of the instructions in *Woods* and *Tucker,* which are similar to those in *Alexander,* we again find no reversible error. However, we do take this opportunity henceforth to prohibit the arcane "malice" language used by the trial courts.

In *Woods* and *Tucker* the allegedly offensive instruction was:

"However, malice aforethought is the necessary element of murder both in the first and second degree. Malice includes not only anger, hatred, and revenge, but every other unlawful, unjustifiable motive. It is not confined to a particular ill will to the deceased, but is intended to denote an act evolving from a wicked and corrupt motive that came down under such circumstances as carry in them the plain indication of a heart fatally bent on mischief.

"Malice means that condition of mind which prompts one to do a wrongful, felonious act intentionally without legal justification; therefore, malice is implied from any deliberate or cruel act against another, however sudden. The time within which the wicked purpose is formed is immaterial. Malice may be either implied or expressed, either one of which is sufficient to satisfy the requirements of the law."

In *Alexander,* the trial judge said:

"We said that the difference between manslaughter and second-degree murder was the absence of the element of malice and the law writers say, they *[sic]* term malice as used in the definition of murder, signifys *[sic]* a wrongful act done intentionally without legal justifi-

cation or excuse, includes all those evil conditions of mind, attending or impelling a homicide without extenuation, excuse, or legal justification.

* * *

"What the law writers have said consistently about the element of malice, members of the jury, is that—is that what we're talking about is a technical word which includes not only anger, hatred, or revenge, but any other unlawful or unjustifiable motive."

An instruction defining malice as including "anger, hatred, revenge, and every other unlawful and unjustifiable motive" was held to be erroneous in *Nye v People,* 35 Mich 16, 17 (1876). The Court reasoned that such an instruction would "remove manslaughter from the catalogue of homicides". *Id.,* p 18. In other words, since malice was a required element of murder and it comprised *every* unlawful motive including anger, hatred, and revenge, anyone who acted in the heat of passion upon sudden provocation or in a criminally negligent manner would have an unlawful motive and thus be guilty of murder rather than some manslaughter offense. However, *People v Borgetto,* 99 Mich 336; 58 NW 328 (1894), upheld the virtually identical instruction because the trial judge followed it with an accurate discussion of the distinction between murder and manslaughter.

In the *Alexander* case, the defendant was not prejudiced because the trial judge, in his instructions, clearly defined manslaughter and distinguished it from murder. In the *Woods* and *Tucker* cases, murder and manslaughter were not distinguished, but the error is still not reversible. In *Tucker* and *Woods,* the defendants were charged with and convicted of first-degree murder; however, they were convicted on the basis that they aided and abetted a third party who did the actual

killing. All the evidence presented reflected a pre-meditated and deliberate killing; none indicated a possible manslaughter.

This must be distinguished from the situation in *Nye,* p 16, where the "homicide occurred in a sudden affray". In that case, the victim was killed in a fight when he accused the defendant of impos-ing on an elderly man with whom he was playing cards. It was disputed whether Nye struck the victim first. Thus, the Court found under those facts that a verdict of manslaughter was a real possibility.

Despite the fact that the instructions on malice in these three cases do not require reversal, we accept the appellants' invitation to announce a fundamental change in Michigan murder instruc-tions. Our decision here was foreshadowed by our opinion in *People v Aaron,* 409 Mich 672, 714; 299 NW2d 304 (1980), where we stated:

"Thus, malice aforethought is the 'grand criterion' which elevates a homicide, which may be innocent or criminal, to murder. However, '[t]he nature of malice aforethought is the source of much of the confusion that attends the law of homicide'. *People v Morrin,* 31 Mich App 301, 310-311; 187 NW2d 434 (1971), *lv den* 385 Mich 775 (1971). See, also, Moreland, Law of Homi-cide (Indianapolis: Bobbs-Merrill, 1952), pp 205-206. Overbroad and ill-considered instructions on malice have plagued appellate courts for decades. See, *e.g., People v Morrin, supra; People v Borgetto,* 99 Mich 336; 58 NW 328 (1894); *Nye v People,* 35 Mich 16 (1876).

"We agree with the following analysis of murder and malice aforethought presented by LaFave & Scott [Crim-inal Law, p 528]:

" 'Though murder is frequently defined as the unlaw-ful killing of another "living human being" with "mal-ice aforethought", in modern times the latter phrase does not even approximate its literal meaning. Hence it is preferable not to rely upon that misleading expres-

sion for an understanding of murder' ".

The appellate opinions of *People v Morrin,* 31 Mich App 301; 187 NW2d 434 (1971), and *People v Goodard (On Rehearing),* 86 Mich App 537; 272 NW2d 716 (1978), have also manifested disapproval of the arcane and potentially misleading language in many jury instructions such as the "heart fatally bent on mischief" found in the *Woods* and *Tucker* instructions.

It is our belief that, although the instructions in these cases do not require reversal and are understandable to the average juror, trial courts should strive to make instructions accurate, fair, and comprehensible to the average person. Time should certainly be taken to ensure that the jury understands what law it must apply to the facts, yet, when instructions must be given on instructions, on "technical terms" such as malice,[13] then the process becomes somewhat self-defeating. It also lengthens the time a jury must listen to instructions, thereby increasing the chance that instructions will be confused or forgotten.

It is with this model in mind, that of avoiding obscure language which has taken on different meanings through the years, that we now require the word "malice" and its progeny to be deleted from trial instructions.[14] Rather than describing

[13] *People v Morrin,* 31 Mich App 301, 320; 187 NW2d 434 (1971).

[14] As 3 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 1637, p 645 states:

"Neither murder nor manslaughter is defined by our statutes, and the definition of murder remains the same as at common law. Murder, under the statute, embraces every offense which would have been murder at common law" (citations omitted),

and later, § 1647, p 660:

"The rule of common law in respect to malice is in no degree changed by the statute which relates only to its application by the jury in determining the degree of guilt." (Citation omitted.)

malice aforethought as a requisite element of murder, the trial courts should indicate the states of mind required for murder—the intent to kill, to cause great bodily harm, or to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. Of course, where relevant, instructions regarding excuse, justification, or mitigation must be given along with the intent instructions in order to reduce the offense of murder to manslaughter, to show that the killing was accidental, or to show some justification such as self-defense.[15]

Defendant Woods suggests that the proposed criminal jury instructions could serve as a model for the trial courts by deleting the bracketed material containing language on "malice". We agree and recommend the use of those instructions without the bracketed "malice" language.[16] We do not

Because "murder" and "malice" retain their common-law meanings and have not been given statutory meanings, we may exercise our supervisory power to mandate that the lower courts no longer use the term "malice" or its progeny.

[15] In *People v Morrin, supra,* p 323, Justice (then Judge) LEVIN suggested:

"Courts might well emphasize that juries can convict of murder only when they are convinced beyond a reasonable doubt that (1) the defendant intended (actually or impliedly) to kill and (2) circumstances of justification, excuse or mitigation do *not* exist. A judge could, for example, charge that the defendant is guilty of the crime of murder if the jurors find, beyond a reasonable doubt, that he killed the victim and that he actually intended to kill the victim or (where relevant), although he did not actually intend to kill, he actually intended to inflict great bodily harm or engaged in behavior the natural tendency of which is to cause death or great bodily harm, unless (where relevant) the jurors have a reasonable doubt whether (i) circumstances of mitigation are present, in which event the offense is reduced from murder to manslaughter, or (ii) the killing was accidental, or (iii) the defendant justifiably acted in self-defense."

We think this suggestion is appropriate in guiding the trial courts henceforth.

[16] After these cases were argued, a revised CJI 16:2:01 was published, and language about malice no longer appears. It now reads:

mandate the use of those particular instructions,

"(1) The defendant is charged with the crime of murder of the first degree. The law, as it applies to this case, states that all wilful, deliberate and premeditated murder shall be murder of the first degree. The defendant pleads not guilty.

"(2) There are two kinds of murder, first degree and second degree, and you will be instructed as to both. Murder is the killing of one person by another, with a certain mental element. For murder, the defendant must have intended to kill, have intended to do great bodily harm, or have wilfully and wantonly disregarded the strong and plain likelihood that death would result, and he must have done so under circumstances which did not justify, excuse or lessen the crime.

"(3) You will first be instructed on murder of the second degree. Keep in mind that all of the elements of second-degree murder are necessary to prove first-degree murder.

"(4) To establish second-degree murder, the prosecution must prove each of these following elements beyond a reasonable doubt:

"(5) First, that the deceased died on or about *[date]*, within the [County of _____/City of Detroit].

"(6) Second, that his death was caused by an act of the defendant; that is, that *[name deceased]* died as the result of *[state the alleged act causing death]*.

"(7) Third, if you find that the death was caused by the defendant, you must determine whether the defendant is guilty of any crime. The killing of a human being by another may be entirely innocent. It is not the act of killing in itself which makes it a crime, but the state of mind with which it is done.

"(8) A killing is not murder if it is justified or excused. [Neither is it murder if it occurs under circumstances which make the killing the lesser crime of manslaughter [or *(some other lesser included offense)]*.]

"(9) Fourth, for murder you must find that the defendant intended to kill, that he intended to do great bodily harm, or that he committed a wanton and wilful act the natural tendency of which was to cause death or great bodily harm. There must be a strong and plain likelihood that death or serious bodily harm will result, and the defendant must have wilfully and wantonly disregarded the knowledge of the possible consequences of death or serious injury.

"(10) In this case the prosecution is charging first-degree murder. To establish first-degree murder the prosecution must prove each of the following additional elements beyond a reasonable doubt:

"(11) That the defendant intended to kill *[name deceased]*;

"(12) That the intent to kill was premeditated. Premeditated means thought out beforehand or designed or planned;

"(13) That the killing was deliberate. Deliberate means that the defendant must have considered the pros and cons of that design and have measured and chosen his actions. The intent must be formed by a mind that is free from undue excitement. This excludes acts done on a sudden impulse without reflection [or as a result of a sudden fight].

but we do strongly approve of their use. Instructions which are equally understandable, accurate, and fair may also be used.

In *Woods* and *Tucker,* the decision of the Court of Appeals is affirmed. In *Alexander,* the judgment of conviction of second-degree murder is reversed, and that case is remanded to the trial court for a new trial.

FITZGERALD, C.J., and KAVANAGH, WILLIAMS, LEVIN, and COLEMAN, JJ., concurred with RYAN, J.

RILEY, J., took no part in the decision of this case.

"(14) For first-degree murder, the killing must be the result of real and substantial reflection. There must be such a lapse of time as would give the mind time to think about the purpose and intent of the killing. The law does not specify the length of that period, and it will vary with individuals and circumstances. The test is not the duration of time but the extent of the reflection. There must be sufficient time to afford a reasonable man time to subject his actions to a second look.

"(15) If you find the defendant guilty of murder, it is your duty to state in your verdict whether he is guilty of murder of the first degree or guilty of the lesser offense of murder of the second degree."