*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOHN BENTON LEWIS,

        Defendant-Appellant.

UNPUBLISHED
October 15, 2020

No. 348634
Berrien Circuit Court
LC Nos. 2017-016054-FH;
           2017-016060-FC

Before: LETICA, P.J., and K. F. KELLY and REDFORD, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree premeditated murder, MCL 750.316(1)(a), and the unlawful manufacture of marijuana, MCL 333.7401(2)(d)(*iii*). He was sentenced as a second-offense habitual offender, MCL 769.10, to life imprisonment for the murder conviction and 590 days for the marijuana conviction. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

On August 13, 2017, after defendant called 911, he and his wife, Carla Lewis, were found in their house in a small room where defendant grew marijuana (the grow room) that could be entered through the utility room. Carla, who was pronounced dead in the grow room, had been shot five times, but defendant had no injuries. The west wall of the grow room contained four bullet holes. Seven marijuana plants were found in the grow room. The house did not appear to have been ransacked, and there were no signs of forced entry. The murder weapon was never found. The prosecutor's theory of the case was that defendant killed Carla because he was having multiple affairs with three other women, he suffered financial difficulties because his business was unsuccessful, and he would receive over $300,000 in insurance and retirement benefits as a result of Carla's death. The jury agreed and convicted defendant as charged.

-1-

II. DEFENDANT'S STANDARD 4 BRIEF – SUFFICIENCY OF EVIDENCE[1]

Defendant contends that his conviction of first-degree murder is not supported by sufficient evidence. We disagree.

We review de novo a challenge to the sufficiency of the evidence. *People v Cline*, 276 Mich App 634, 642; 741 NW2d 563 (2007). We view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt. *Id.*

"The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v Woods*, 416 Mich 581, 599 n 2; 331 NW2d 707 (1982) (quotation marks and citation omitted). "Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a 'second look.' " *People v Oros*, 502 Mich 229, 242; 917 NW2d 559 (2018) (citation omitted). Identity is an element of every offense. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

Although the prosecutor's case was premised on circumstantial evidence, circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the offense. *People v Williams*, 268 Mich App 416, 419; 707 NW2d 624 (2005). In reviewing the sufficiency of the evidence, this Court will not interfere with the jury's role in determining the weight of the evidence or the credibility of the witnesses. *People v Eisen*, 296 Mich App 326, 331; 820 NW2d 229 (2012); see also *People v Bowyer*, 108 Mich App 517, 522; 310 NW2d 445 (1981) ("It is for the jury to decide who to believe and what testimony of a particular witness to believe.").

Motive is not an essential element of first-degree murder, but evidence of motive is always relevant. *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008). It is particularly relevant in cases in which the proofs are circumstantial. *Id.* There was evidence to suggest that defendant had a motive to kill Carla. Although married to Carla, defendant was engaging in sexual relations with three other women. He had expressed to two of those women that he wanted a future with them. Upon Carla's death, defendant stood to receive $300,000 from Carla's life insurance policies and retirement package. Not long before Carla's death, defendant was unable to pay the rent for 1046 Bell Road, where he operated the Seven Leaves Compassion Club. The owner of the Bell Plaza, Michael Khosravani, asked defendant to move Seven Leaves from the building.

---

[1] In his brief filed under Administrative Order No. 2004-6, Standard 4, defendant challenged the sufficiency of the evidence to support his murder conviction, prosecutorial misconduct, and ineffective assistance of counsel. We first address defendant's challenge to the sufficiency of the evidence because it sets forth the factual evidence to support his conviction and provides further factual context for a resolution of the remaining issues. We resolve defendant's remaining Standard 4 Brief issues pertaining to prosecutorial misconduct and ineffective assistance of counsel with those claims as raised in the brief on appeal filed by his appellate counsel.

Khosravani testified that he then merely allowed defendant to store items at 1036 Bell Road for a couple weeks. Also, Christy Pruett, Carla's daughter, testified that Carla tolerated defendant's grow room but was frustrated with the amount of time that defendant spent at Seven Leaves and the fact that Seven Leaves was not doing well financially.

During the afternoon of August 13, 2017, defendant asked Justin Hicks to remove a bag of ammunition from 1036 Bell Road. The ammunition in the bag included eight boxes of Tulammo nine-millimeter Luger caliber cartridges, as well as seven loose Tulammo nine-millimeter Luger caliber cartridges. Almost all of the Tulammo cartridges in the bag had a silver bullet. The five cases found at defendant and Carla's house had a Tulammo head stamp, and the bullets found in the grow room were silver. Detective Lieutenant Gregory Sanders testified that he had never previously seen Tulammo ammunition at a crime scene. In January 2019, Detective Lieutenant Sanders and another detective visited 12 local sports and gun stores. None of those stores carried Tulammo nine-millimeter cartridges that had a silver bullet. Detective Sergeant Karsten testified that two different Kahr Arm models could have fired the bullets that were found at defendant and Carla's house. The bag of ammunition included a Kahr magazine. There was testimony that most guns come with two magazines. In the week before Carla's murder, defendant used Google to search the Internet for firearms, including Kahr firearms, as well as silencers, and accessed You Tube videos on home made silencers. Defendant had also asked Christopher Fulce, an acquaintance, for a recommendation for a gun.

Defendant told Detective Lieutenant Rick Biggart that he had asked Carla to go downstairs and to help him move marijuana plants to the grow room. He also said that, while he and Carla were in the grow room, two men appeared in the doorway. Defendant gave a detailed description of the shooter. But Detective Lieutenant Biggart testified that defendant's detailed description of the shooter made no sense. The grow room was dark—it had no lights, except for grow lights— and one's natural instinct, when a gun is fired, is to look down. Four bullet holes were found in the west wall of the grow room. Detective Lieutenant Sanders, who was qualified as an expert in firearms training, opined that, given the location of the bullet holes, the shooter had been shooting at one person. Deputy Jessica Frucci saw the bullet holes when she was in the grow room, and she also believed that the shooter had been shooting at one person. Additionally, the 911 operator who answered defendant's call testified that it sounded as if defendant put the phone down and "kept going away from" it. Detective Lieutenant Sanders agreed that it sounded like defendant was moving around during the 911 call. Defendant's 911 call ended before emergency personnel were dispatched. After the call ended, defendant waited more than five minutes to make another 911 call. Although defendant was found lying in blood in the grow room, his cell phone, which was also found in the grow room, had little blood on it.

Herbert McGraw testified that, while in jail, defendant bragged that the police did not have the murder weapon and that he was going to get off. In this conversation with McGraw, defendant also represented that he took money and other items out of a safe to make it look like a robbery. On August 8, 2017, in text messages, defendant informed one of the women with whom he was having an affair that she did not have to worry too much about Carla because he and Carla "will be over sooner than you think." Defendant had told another one of the women with whom he was having an affair that he no longer wanted to be with Carla and that he wanted out of the marriage.

When viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could find beyond a reasonable doubt that defendant intentionally killed Carla and that the killing was premeditated and deliberate. See *Bennett*, 290 Mich App at 472; *Cline*, 276 Mich App at 642. When viewed in a light most favorable to the prosecution, a rational trier of fact could find the elements of the crime charged were proven beyond a reasonable doubt. Defendant's conviction of first-degree murder is supported by sufficient evidence.

## III. DEMONSTRATIVE EVIDENCE

Defendant contends that the trial court erred by allowing the prosecutor to use a full-sized replica of the grow room as demonstrative evidence. We disagree.

We review a trial court's evidentiary decisions for an abuse of discretion. *Unger*, 278 Mich App at 216. A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*. at 217.

Demonstrative evidence is admissible when it may aid the fact-finder in reaching a conclusion on a matter material to the case. *People v Castillo*, 230 Mich App 442, 444; 584 NW2d 606 (1998). "[D]emonstrative evidence . . . must satisfy traditional requirements for relevance and probative value in light of policy considerations for advancing the administration of justice." *Id.* Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Even if relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403.

Defendant does not challenge the grow room replica on relevancy grounds, but rather, submits that the size and continuous display was unfairly prejudicial. He further contends that there was no need for the replica to be life-sized. However, the prosecutor's purpose in constructing the replica was to allow the jury to see the actual size of the grow room and the access door to it, the location of defendant and Carla in the room when the police arrived, and the location of the bullet holes in the west wall. Indeed, the police questioned defendant's ability to clearly see the alleged perpetrators of the crime in light of the grow room lighting and the access door. The grow room in its actual size allowed the jury to assess the probability of defendant's version of the shooting, i.e., that two African-American men appeared in the doorway of the grow room and the man in front started shooting at them. Moreover, despite the limited size of the room, Carla was shot five times, but defendant was not struck by any bullets. The prosecutor's life-size replica allowed the jurors to visualize the actual size of the grow room, the access door, and how much space two people take up in the grow room. Contrary to defendant's contention, a model size recreation of the grow room would have not served the same purpose as the life-size replica. Accordingly, the trial court did not abuse its discretion in determining that the life-sized replica, even though it may have taken up a significant amount of space in the courtroom, was not unfairly prejudicial. See *Unger*, 278 Mich App at 216.

Additionally, defendant questioned the grow room replica's constant presence in the courtroom when the display was not pertinent to every witness. The prosecutor noted that multiple

-4-

witnesses, including responding police officers, emergency personnel, and evidence technicians would testify regarding their activity in the room. He planned to call the responding police officers and the paramedic, and their testimony would incorporate the display. The prosecutor indicated that it took 20-minutes to "tear down" the replica. The trial court found that the "tear down" and rebuild of the grow room replica was not an efficient use of time for the court, the jury, and the parties. Under the circumstances, the trial court's decision to allow the replica to remain in the courtroom for the duration of trial fell within the range of reasonable and principled outcomes. See *id.* at 217. Had the trial court required the prosecutor to take down the replica for witnesses who would not testify about the grow room, there would have been numerous delays in the trial.

Furthermore, the trial court rejected defendant's claim that the replica hindered his view of the jury. Although defendant indicated at the start of the second day of trial that the replica prevented him from seeing the jury, this statement was made before the jury was brought into the courtroom. Once the replica was brought into the courtroom, defense counsel acknowledged that the defense table was moved. Additionally, the trial court noted that the walls of the grow room replica were "see-through." After the jury entered the courtroom, defendant never informed the trial court, either that day or any other day of trial, that he could not see the jury. Accordingly, the record does not support defendant's claim that the replica prevented him from seeing the jury.

## IV. PROSECUTORIAL MISCONDUCT[2]

### A. "EXECUTED" AND "BLOOD ANGELS"

First, defendant alleges that the prosecutor committed misconduct when he stated during jury selection that defendant "executed" Carla. Because defendant waived this particular error, we disagree.

Waiver is the intentional relinquishment or abandonment of a known right. *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). Defense counsel objected when the prosecutor first stated during voir dire that defendant "executed" Carla and, at a bench conference, defense counsel requested a mistrial. At that time, the trial court read the jury instruction regarding what constitutes evidence. It declined the defense request to caution the prosecutor, but instructed the attorneys not to introduce facts and to "use mundane terms." But, at the conclusion of jury selection, when the trial court gave defense counsel the opportunity to argue for a mistrial, defense counsel, after conferring with defendant, stated that she was withdrawing the motion. Defense counsel made a strategic decision to withdraw her motion for a mistrial and to accept the jury as chosen. By intentionally relinquishing her request for relief, defense counsel extinguished any prosecutorial misconduct. See *id.*

---

[2] Although defendant characterizes the prosecutor's statements as misconduct, this Court recently explained that a fairer label for most claims of prosecutorial misconduct would be "prosecutorial error," because only the most extreme and rare cases rise to the level of "prosecutorial misconduct." *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). However, we will use the phrase "prosecutorial misconduct"" because it has become a term of art in criminal appeals. *Id.*

Defendant also asserts that the prosecutor committed misconduct when he continued to use the word "executed" and other versions of the word in his opening statement and in his closing and rebuttal arguments. Additionally, defendant argues that the prosecutor committed misconduct when he stated in closing argument that defendant made "blood angels" in Carla's blood. Although the repeated and persistent use of the variations of the term "executed" were unnecessarily stated by the prosecutor and ill-advised, and the inference that defendant made "blood angels" was weak, we do not find plain error affecting defendant's substantial rights.

Because defendant did not contemporaneously object to the alleged misconduct, these claims of prosecutorial misconduct are unpreserved. *Bennett*, 290 Mich App at 475. We review unpreserved claims of prosecutorial misconduct for plain error affecting the defendant's substantial rights. *People v Fyda*, 288 Mich App 446, 460-461; 793 NW2d 712 (2010). Plain error is error that is clear or obvious. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

The test for prosecutorial misconduct is whether the defendant was denied a fair and impartial trial. *People v Mesik (On Reconsideration)*, 285 Mich App 535, 541; 775 NW2d 857 (2009). Claims of prosecutorial misconduct are reviewed on a case by case basis, with the challenged remarks examined in context. *People v McLaughlin*, 258 Mich App 635, 644; 672 NW2d 860 (2003). Prosecutors are afforded great latitude regarding their arguments and conduct at trial. *People v Mann*, 288 Mich App 114, 120; 792 NW2d 53 (2010). A prosecutor may argue the evidence and all reasonable inferences from the evidence as it relates to his theory of the case. *Id.* A prosecutor need not present his argument in the blandest terms possible. *People v Meissner*, 294 Mich App 438, 456; 812 NW2d 37 (2011); see also *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996) (stating that "prosecutors may use 'hard language' ").

It was the prosecutor's theory, which was supported by reasonable inferences from the evidence, that defendant planned to kill Carla and that defendant, after he got Carla in the grow room, shot her five times. Under this theory, the word "executed," while not the blandest term possible, describes defendant's conduct. He asserted that defendant "brutally executed his wife," committed the act in the "execution chamber," the entry wounds indicated that Carla faced "her executioner," there was no escaping the "impending execution," and the garage door was closed to prepare for "the execution." These statements were among the many references in his opening statement and in his closing and rebuttal arguments. A prosecutor should not appeal to the jury's sympathies by using terminology designed to inflame the jury against defendant. See *People v Watson*, 245 Mich App 572, 591-592; 629 NW2d 411 (2001). Although emotional language is an important weapon in the prosecutor's arsenal, it must be tempered against the prosecutor's duty to ensure that a defendant receives a fair trial while attempting to convict the guilty. See *Ullah*, 216 Mich App at 678-679. Nonetheless, a well-tried vigorously argued case ought not be overturned for isolated improper remarks that could have been cured if a proper instruction had been requested. *Id*. at 679. Plain error affecting defendant's substantial rights was not established.

Additionally, Deputy Angela Baggett testified that, when she opened the door to the grow room, defendant was lying on top of blood, with his arms and legs stretched out. He had blood on his forearms. Deputy Baggett also testified that Exhibit 21 showed the blood that defendant was lying on in the grow room. There are smears in the blood. On two occasions during closing argument, the prosecutor characterized defendant's actions as making "blood angels." It is questionable whether the prosecutor's statements were supported by reasonable inferences arising

from the evidence. However, the jury was instructed that the verdict must be premised on properly admitted evidence, the lawyers' statements were not evidence, and the jury should only accept statements made by counsel that were supported by the evidence, common sense, or general knowledge. A jury is presumed to follow its instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). Under the circumstances, plain error affecting substantial rights was not established.

## B. STANDARD 4 BRIEF

In his Standard 4 brief, defendant contends that the prosecutor committed misconduct by (1) calling witnesses who had received deals for their testimony; (2) by impeaching Kim Fowler, defendant's private investigator, with a website that did not concern Tulammo ammunition; and (3) by asserting in closing argument that defendant was deleting text messages from his phone while he was making the 911 phone calls. Because defendant did not contemporaneously object to the alleged misconduct, the claims of prosecutorial misconduct are unpreserved. See *People v Pipes*, 475 Mich 267, 277; 715 NW2d 290 (2006); *Bennett*, 290 Mich App at 475. We review unpreserved claims of prosecutorial misconduct for plain error affecting the defendant's substantial rights. *Fyda*, 288 Mich App at 460-461.

Regardless of whether any witness actually received a deal for his or her testimony, a prosecutor is only required to disclose information to the defense that could materially affect the credibility of the prosecutor's witnesses. See *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014); *People v McMullan*, 284 Mich App 149, 157; 771 NW2d 810 (2009), aff'd 488 Mich 922 (2010); see also MCR 6.201(B)(5). Defendant makes no argument that the prosecutor failed to disclose any agreement or benefit that any witness received in exchange for his or her testimony. Accordingly, defendant's argument that the prosecutor engaged in misconduct by using witnesses who received deals for their testimony is without merit.

An appellant has the burden of providing this Court with a record to verify the factual basis of any argument upon which reversal is predicated. *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000). Nothing in the record confirms defendant's assertion that the website the prosecutor showed Fowler did not concern Tulammo ammunition. Fowler failed to testify that the website concerned ammunition not made by Tulammo. Additionally, while defense counsel told the trial court the following day that the website concerned ammunition that was made in Bosnia by a different company, she gave the trial court no documentation to support her assertion. Accordingly, defendant has not shown that the prosecutor used a website about ammunition not produced by Tulammo to impeach Fowler.

But, even if the website used by the prosecutor concerned ammunition made by a Bosnian company and the impeachment constituted misconduct, the misconduct did not affect defendant's substantial rights. See *Fyda*, 288 Mich App at 460-461. The prosecutor used the website to impeach Fowler's testimony that no ammunition made by Tulammo had a brass case. However, all the Tulammo ammunition in the present case, i.e., the cases found at defendant and Carla's house, the cartridges in the bag that was turned over by Hicks, and the cartridge found in Carla's car, had a silver case. The question whether Tulammo made cartridges that have a brass case was generally irrelevant to the facts of the present case. Under these circumstances, the impeachment

had very little value in the case, and the alleged misconduct did not affect the outcome of defendant's trial. See *Carines*, 460 Mich at 763.

"A prosecutor may not make a statement of fact to the jury that is unsupported by evidence, but she is free to argue the evidence and any reasonable inferences that may arise from the evidence." *People v Ackerman*, 257 Mich App 434, 450; 669 NW2d 818 (2003). In his closing argument, the prosecutor asserted that a "weird" thing about the case was that defendant had deleted all his messages from his phone except those that were to or from Carla or "Bill's Buddy." This assertion was supported by the evidence. Detective Sergeant Peek Cory testified that defendant deleted all his messages from August 13, 2019, that were not to or from Carla or Bill's Buddy.

But the prosecutor also indicated that defendant had deleted a message that he received from Christopher Fulce at 5:34 p.m. while he was making the 911 phone calls. Detective Sergeant Peek testified that, although the 5:34 p.m. message from Fulce was deleted, he did not know when the message was deleted. However, given that the message was received only nine minutes before defendant made his first 911 call, and defendant would have only called 911 after Carla was shot, a reasonable inference is that defendant deleted the message while he was making the 911 calls. The prosecutor did not clearly and obviously misstate the evidence or argue an inference not supported by the evidence. See *Carines*, 460 Mich at 763.

## V. DESTRUCTION OF EVIDENCE

Defendant contends that, because the west wall of the grow room that contained bullet holes was destroyed, he was denied his right to due process because the wall's destruction impeded his ability to challenge the prosecutor's case. We disagree.

We review a trial court's factual findings in a ruling on a motion to suppress for clear error, but we review de novo a trial court's interpretation of the law or application of a constitutional standard to uncontested facts. *People v Martin*, 271 Mich App 280, 297; 721 NW2d 815 (2006).

A defendant's right to due process is violated when the prosecution suppresses or fails to disclose material exculpatory evidence, regardless of whether the prosecution acted in good or bad faith. *Illinois v Fisher*, 540 US 544, 547; 124 S Ct 1200; 157 L Ed 2d 1060 (2004). However, when the state fails to preserve "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," there is no violation of the defendant's right to due process unless the defendant can show bad faith on the part of the police. *Id*. at 547-548; *Arizona v Youngblood*, 488 US 51, 57-58; 109 S Ct 333; 102 L Ed 2d 281 (1988). "Absent the intentional suppression of evidence or a showing of bad faith, the loss of evidence that occurs before a defense request for its production does not require reversal." *People v Johnson*, 197 Mich App 362, 365; 494 NW2d 873 (1992). A defendant has the burden of showing that the evidence was exculpatory or that the police acted in bad faith. *Id*.

At a January 28, 2019 hearing, the prosecutor informed the trial court that officers with the crime laboratory destroyed the west wall of the grow room in order to find the bullets that had made the four bullet holes in the wall. The prosecutor's explanation at the hearing of what

happened to the wall in the grow room was consistent with Detective Sergeant Russell Karsten's testimony at trial. Detective Sergeant Karsten testified that he measured the location of the four bullet holes from the floor and from the north wall. He placed rods in the bullet holes in order to attempt to determine the trajectory of the bullets. He then used a hammer to remove the wall so that he could look for the bullets. Using the hammer, Detective Sergeant Karsten made numerous holes in the drywall and then pulled the drywall off the studs. He found four bullets.

The wall was not exculpatory evidence. It was evidence that could have been subjected to tests. See *Youngblood*, 488 US at 57. Because Detective Sergeant Karsten removed the wall in an attempt to locate other evidence, i.e., the bullets, the wall was not destroyed in bad faith. Accordingly, the destruction of the wall did not violate defendant's right to due process. See *id*. at 57-58.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant submits that he was denied effective assistance of counsel because defense counsel (1) failed to challenge for cause two jurors who expressed a dislike for guns; (2) failed to follow the provision in the scheduling order that required her to premark all exhibits and provide an exhibit list and lacked knowledge regarding the procedure to admit exhibits; (3) failed to object to references of his pretrial incarceration and to move for a mistrial; and (4) generally failed to prepare and present his case at trial, as argued in his Standard 4 Brief. We disagree. Because an evidentiary hearing has not been held on defendant's claims, our review is limited to mistakes apparent on the lower court record. See *People v Seals*, 285 Mich App 1, 17, 19-20; 776 NW2d 314 (2009).

To establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance fell below objective standards of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceedings would have been different. *People v Uphaus (On Remand)*, 278 Mich App 174, 185; 748 NW2d 899 (2008). A defendant must overcome a strong presumption that counsel engaged in sound trial strategy. *People v Armstrong*, 490 Mich 281, 290; 806 NW2d 676 (2011).

## A. IMPARTIAL JURY

A criminal defendant has a constitutional right to be tried by an impartial jury. *People v Miller*, 482 Mich 540, 547; 759 NW2d 850 (2008). Jurors are presumed to be impartial until the contrary is shown, and the defendant bears the burden of showing that "the juror was not impartial or at least that the juror's impartiality is in reasonable doubt." *Id*. at 550. A prospective juror may be excused for cause if the juror "is biased for or against a party or attorney," "shows a state of mind that will prevent the person from rendering a just verdict," or "has opinions or conscientious scruples that would improperly influence the person's verdict." MCR 2.511(D)(2), (3), and (4). Generally, a juror is biased when the juror "has 'preconceived opinions or prejudices, or such other interest or limitations as would impair his or her capacity to render a fair and impartial verdict.' " *People v Eccles*, 260 Mich App 379, 382; 677 NW2d 76 (2004) (citation omitted). Decisions regarding the selection of jurors generally involve matters of trial strategy. *People v Johnson*, 245 Mich App 243, 259; 631 NW2d 1 (2001) (opinion by O'CONNELL, P.J.). Because "[p]erhaps the most important criteria in selecting a jury include a potential juror's facial expressions, body

language, and manner of answering questions," this Court is disinclined to find ineffective assistance of counsel on the basis of counsel's failure to challenge a juror. *Unger*, 278 Mich App at 258.

During jury selection, Juror C. indicated that he or she was against the "NRA"[3] and guns that he or she described as "big ones," "fast ones," "thumpers," and "things like that." Juror C. was also against the open carry of firearms. Juror N. stated that he or she too was against open carry. While Juror N. understood why a person would want to have a gun at home for personal protection, he or she believed that only people "wearing a badge" should carry a gun in public. Juror N. answered, "No," when defense counsel stated, "But the gun itself isn't gonna shut you down—."

Defense counsel was not ineffective for failing to challenge Juror C. and Juror N. for cause. While Juror C. and Juror N. indicated that they were against open carry, the case did not involve the open carry of a gun. Juror N. also indicated that the use of a gun to kill Carla would not prohibit him or her from considering all the evidence. Additionally, while Juror C. indicated a dislike for the NRA and for "big" and "fast" guns, the case did not involve a big and fast gun, such as an assault rifle. Additionally, nothing in Juror C.'s answers indicated that his or her dislike for such guns would prohibit him or her from impartially considering all the evidence. The answers of Juror C. and Juror N. did not indicate that either had preconceived opinions or prejudices or other limitations that would impair their ability to render a fair and impartial verdict. See *Eccles*, 260 Mich App at 382. Accordingly, defendant has not overcome the strong presumption that defense counsel engaged in sound trial strategy by not challenging Juror C. and Juror N. for cause. See *Armstrong*, 490 Mich at 290.

## B. EXHIBIT SUBMISSION AND PREPARATION

With regard to defendant's second claim of ineffective assistance, defense counsel did fail to follow the scheduling order. Before trial began, she did not submit an exhibit list. She also did not premark her exhibits. Additionally, during the first few days of trial, the trial court admonished defense counsel for showing an exhibit on the screen before the exhibit was admitted into evidence, instructed defense counsel on the proper procedure for admitting an exhibit, and assisted defense counsel in her attempts to lay a foundation for the admission of exhibits. However, defendant has not shown that he was prejudiced by defense counsel's failure to following the scheduling order or her alleged lack of knowledge regarding the procedure for admitting exhibits. Defendant does not identify any exhibit that was excluded.

We reject defendant's claim that he was prejudiced because, given the number of interruptions in trial to deal with defense counsel's lack of preparation and knowledge, it was likely that the jury knew something was amiss with defense counsel's case. "An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like." *Strickland v Washington*, 466 US 668, 695; 104 S Ct 2052; 80 L Ed 2d 674 (1984). A court presumes that the jury acts according to the law, *id*. at 694, and follows its instructions, *Graves*, 458 Mich at 486. During opening and closing

---

[3] In this context, "NRA" presumably referred to the National Rifle Association.

instructions, the trial court instructed the jury that, in reaching a verdict, it was only to consider the evidence that was admitted. Nothing that the trial court said, including its rulings on objections, was meant to reflect its opinion about the case. Its "comments, rulings, questions, and instructions" were not evidence. Additionally, during opening instructions, the trial court informed the jury that there would be times that it and the lawyers would have discussions out of its hearing. The jury was to pay no attention to those interruptions. The trial court twice reminded the jury of this during trial. Because of the instructions that the jury received, which the jury is presumed to have followed, *id.*, defendant's speculation that the jury may have viewed something was amiss does not establish that, but for defense counsel's deficient performance, there is a reasonable probability that the result of his trial would have been different. See *Uphaus (On Remand)*, 278 Mich App at 185.

## C. PRETRIAL INCARCERATION

In arguing that defense counsel was ineffective for failing to object to references to his pretrial incarceration, defendant relies on MRE 404(b) and caselaw indicating that evidence of a defendant's prior conviction may be prejudicial because the jury will misuse the evidence by determining that the defendant has a bad character. See, e.g., *People v Griffin*, 235 Mich App 27, 36; 597 NW2d 176 (1999), overruled on other grounds by *People v Thompson*, 477 Mich 146 (2007). However, defendant fails to acknowledge that he was in jail awaiting trial on the charges for which he was convicted. He was not in jail because of some other criminal act he committed.

The trial court prohibited the attorneys from using certain words, such as "jail" and "cell," in questioning McGraw and defense witnesses, Raymond Greathouse and Derrell Porter, about McGraw's jailhouse conversation with defendant. However, the context of the conversation became apparent from the testimony. For example, McGraw indicated that he had a conversation with defendant regarding what "he was in there for." McGraw testified about statements that defendant made. According to McGraw, defendant said that he made it look like a robbery, that he was going to get off because the police did not have the murder weapon, and that a witness, who had told on him, might not be around to testify. These statements implicated defendant as the person who killed Carla. When a jury has to determine the weight and credibility of a confession, the jury has to be placed in the position of knowing all the circumstances of the confession. *People v Anglin*, 111 Mich App 268, 290; 314 NW2d 581 (1981). Because the jury had to determine whether McGraw was credible and how much weight to give his testimony, the jury's knowledge of where the conversation between McGraw and defendant occurred was crucial. Accordingly, any objection to any reference to defendant's pretrial incarceration would have been futile, as would any motion for a mistrial. Defense counsel was not ineffective for failing to make futile objections or motions. See *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998).

## D. TRIAL PREPARATION AND PRESENTATION

In his Standard 4 Brief, defendant raises numerous claims of ineffective assistance of counsel. Because defendant did not preserve his claims of ineffective assistance of counsel by raising them in a motion for a new trial or an evidentiary hearing filed with the trial court or in a motion to remand filed with this Court, our review is limited to errors apparent on the record. See *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

Defendant alleges that defense counsel failed to familiarize herself with caselaw regarding jury selection, failed to seek information, failed to consult with experts, failed to protect his constitutional rights, failed to object to blatant misconduct by the prosecutor, made many mistakes for which the trial court admonished her, did not prepare for closing argument, and failed to object to many inflammatory and false statements made by the prosecutor during his closing argument. Defendant has not properly briefed any of these claims, and therefore, the claims are abandoned. *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999); see also *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008) (stating that a defendant may not leave it to this Court to search for a factual basis to sustain or reject his position); *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998) (stating that an appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims).

Defendant contends that he repeatedly asked defense counsel to excuse certain prospective jurors and that defense counsel, in response to his requests, told him to be quiet and to let her do her job. There is no indication in the record that defense counsel ever told defendant to be quiet and to let her do her job. Accordingly, defendant has not established the factual predicate for his claim. See *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

Defendant submits that defense counsel spent no more than 70 minutes with him in preparation for trial and that she ignored his requests that certain witnesses and evidence be presented at trial. Because defendant does not identify the witnesses and the evidence that he requested be presented, defendant has not demonstrated that, but for defense counsel's alleged failure to present certain witnesses and evidence, there is a reasonable probability that the result of his trial would have been different. *Uphaus (On Remand)*, 278 Mich App at 185; see also *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015) (stating that counsel's failure to call a witness is only considered ineffective assistance of counsel if it deprived the defendant of a substantial defense).

Defendant asserts that several witnesses, who had been subpoenaed, did not testify because defense counsel had sent them home too early. He also claims that, because of defense counsel's conduct, a "ballistic witness" did not testify. Additionally, defendant claims that defense counsel ignored his demands that he be allowed to testify. These claims are not supported by the record. First, the only defense witness whom defense counsel had planned on calling as a witness and who did not testify was Dominic Grosso. Defense counsel chose to call Kim Fowler instead of Grosso. Decisions regarding which witnesses to call are matters of trial strategy. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. *Id*. Second, defendant was questioned on the record by defense counsel about whether he wanted to testify. Defendant stated that he was choosing not to testify. Accordingly, the claims for ineffective assistance of counsel are without merit.

Affirmed.

/s/ Anica Letica
/s/ Kirsten Frank Kelly
/s/ James Robert Redford

-12-